307 Ga. 789
FINAL COPY

S19A1493.  FLOYD v. THE STATE.
S19A1494.  HARRELL v. THE STATE.

BETHEL, Justice.

A Dougherty County jury found Louis Floyd, Jr. and Tara Lee Harrell guilty of murder and other offenses in connection with the death of William Jackson.[1] Floyd and Harrell now appeal. Floyd

---

[1] The crimes occurred on August 14, 2013. On November 6, 2013, a Dougherty County grand jury jointly indicted Floyd and Harrell for the crimes of malice murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a knife during the commission of a felony. Floyd and Harrell were tried jointly from March 9 to 18, 2015. Floyd was found guilty on all counts. Harrell was found not guilty of malice murder but was found guilty of the remaining counts. On April 6, 2015, Floyd was sentenced to a term of life imprisonment for malice murder and a consecutive term of probation of five years for possession of a knife during the commission of a felony. As to Floyd, the felony murder count was vacated by operation of law, and the aggravated assault count merged with the malice murder count. The same day, Harrell was sentenced to life in prison for felony murder and a consecutive term of probation of five years for possession of a knife during the commission of a felony. As to Harrell, the aggravated assault count merged with the felony murder count. Floyd filed a motion for new trial on April 30, 2015, which he later amended through new counsel on April 10, 2017. The trial court held a hearing on the motion, as amended, on April 10, 2017, and it denied the motion on November 28, 2018. Floyd filed a notice of appeal on December 19, 2018. Harrell filed a notice of appeal on April 17, 2015. On March 24, 2017, through new counsel, Harrell filed a motion to withdraw the notice of appeal and

argues that the trial court erred by not granting his motion to sever the trial and by failing to charge the jury on justification. He also claims that his trial counsel provided ineffective assistance. Harrell argues only that the evidence presented by the State against her was insufficient to support the verdicts and that the trial court should have granted her motion for directed verdict. Finding no error, we affirm.

1. The evidence presented at trial showed the following. Floyd and Harrell lived together for two years beginning in September 2011, during which time they were in a romantic relationship. Floyd is a black male, and Harrell is a white female.

Harrell also had a relationship with William Jackson, whom she and others knew as "TV Man."[2] Harrell and Jackson met in 2011

---

proceed out-of-time on a motion for new trial. Following a hearing on February 15, 2019, the trial court denied Harrell's motions on March 12, 2019, on the basis that it was without jurisdiction to grant them after Harrell filed her notice of appeal. Harrell has not appealed that order. These cases were docketed to the Court's August 2019 term, submitted for decisions on the briefs, and consolidated for opinion.

[2] Jackson was known to many people in the community as "TV Man" because he was an electrician and had a particular skill for repairing televisions.

while Harrell's sister, Donna Timbes, was living at the Dollar Inn in Dougherty County. Jackson also lived at the Dollar Inn. Harrell and Jackson had a sexual relationship, and they had a child together who was born in early 2013.

The relationship between Floyd and Harrell became strained and sometimes violent after Floyd learned that Harrell had started seeing Jackson. Floyd and Harrell had daily arguments about Harrell's relationship with Jackson, which were sometimes observed by others. They also argued because Floyd had begun sleeping with Timbes. Harrell would regularly go to the Dollar Inn to see Jackson after she and Floyd argued.

Jessica Arnold testified that she spoke with Floyd and Harrell at the gas station where Arnold worked. When Harrell mentioned Jackson in the context of being the father of Harrell's child, Floyd began to get angry and told Harrell that if he ever caught her around Jackson again, he would kill Jackson.

Another friend, Brandi Luke, testified that she had also been around Floyd and Harrell several times when Jackson came up in

3

conversation. Luke testified that, through those conversations (which occurred while Harrell was pregnant), she learned that Floyd did not like Jackson because Jackson might have been the father of Harrell's child. Luke testified that Floyd spoke very badly about Jackson, and that Floyd "let it be known very clearly" on multiple occasions that if Harrell went to see Jackson, there would be "repercussions."

Timbes also testified that Floyd and Jackson did not get along, and that Floyd said that he did not like Jackson because Jackson was seeing Harrell. Timbes testified about an incident in 2011 in which police were called to Floyd's house after he and Harrell got in an argument and punched each other when Floyd refused to take Harrell to the Dollar Inn. Timbes also testified that she had previously heard Floyd tell Harrell that if he ever saw her with Jackson again, he was going to kill Jackson.

Another sister of Harrell, Stephanie, testified that Floyd sometimes came to her house with Harrell. Stephanie testified that Floyd would regularly bring up Jackson in conversation and say that

4

Floyd wanted to kill Jackson for getting Harrell pregnant.

Harrell testified that, on August 14, 2013, she drove herself and Floyd to the Dollar Inn to meet someone called "Georgia Boy" to buy drugs and alcohol. Harrell parked the car behind the building near a laundry room.

When they realized that Georgia Boy was not in his room, Harrell and Floyd walked to the front of the Dollar Inn and saw Shelby Royal (who was in a relationship with Timbes, Harrell's sister) and Carl Grant standing near a dumpster. Harrell said to Royal, "Have you heard what your girlfriend has been doing?" This angered Floyd because it was apparently in reference to Timbes trying to sleep with Floyd. Floyd knocked a drink from Harrell's hand and pushed her down because he thought she was trying to sleep with Royal. Floyd then waved a knife at Royal and Grant and threatened to kill them, after which Grant left and walked to his room on the corner of the Dollar Inn.

Floyd and Harrell walked back to their car. A man who had been sitting inside the laundry room heard some loud talking, came

5

outside, and saw Floyd and Harrell standing outside their car. When he asked them to be quiet, Floyd told Harrell, "Come on, b****. Let's go. Shut up and get in the f***ing car." They got back in the car, and Harrell began to drive away. According to Harrell, Floyd then hit her in the face, causing her nose to bleed. She stopped the car, parked in front of the Dollar Inn, and got out. Seeing that Jackson's door was open, Harrell ran into Jackson's room so that she could use his bathroom.

According to Harrell, Jackson was sitting on a chair inside the room repairing an electronic device. Harrell told him she needed some tissue because Floyd had hit her, and Jackson let her go to his bathroom where Harrell began washing her hands. As Harrell moved back toward the door, Floyd ran in and said, "B****, what you in here for?" Harrell attempted to pull Floyd out of the room as he and Jackson began to fight, but Floyd pushed Harrell through the door of the room out onto the sidewalk. Outside, Harrell called out for help. Floyd and Jackson continued to "wrestle" inside the room, and Jackson tried to force Floyd out of the room. Their

struggle continued against one of the walls of the room, and Harrell then saw Floyd stab Jackson in the stomach. Floyd then ran out of Jackson's room and yelled, "Come on, b****. Let's go." Harrell testified that she got into the passenger seat of the car, and that Floyd drove away.

Other accounts of the incident differed from the one given by Harrell at trial. According to Royal and Grant, after Floyd threatened them, Harrell started walking toward Jackson's room at the Dollar Inn. Harrell got about halfway inside the room and was shutting the door when Floyd ran over and "busted the door." Harrell then fell to the ground, and Floyd jumped like he was trying to "get at" someone. Floyd and Jackson began "wrestling," and Floyd yelled, "I knew you been sleeping with her." Harrell then screamed, "Stop, stop, you['re] going to kill him." Floyd and Harrell then came out of Jackson's room, and Floyd was holding a knife. They got into the car, and Harrell drove them away.

A resident of the Dollar Inn, John Barrentine, testified that he observed a car pull up near the door to Jackson's room. Floyd and a

white woman[3] got out of the car and knocked on Jackson's door, and Jackson let them in. A short time later, the woman fell out of the room through the doorway and said, "Help, they are killing each other." Barrentine could see Floyd and Jackson fighting inside the room. Floyd had Jackson pressed against the wall and appeared to be punching him. Floyd then came out of the room, folded up a knife, which appeared bloody, and said, "Let's go" to the woman, who had not re-entered the room while the fight ensued. Floyd and the woman then got back into their car and drove away.

Another resident of the Dollar Inn, Robert McGee, testified that on the night of the incident, he was sitting on the steps of a stairwell at the Dollar Inn drinking beer. He saw a woman get "pushed down" and knocked out of Jackson's room after which a black man[4] went into Jackson's room and closed the door. McGee could hear arguing coming from inside the room. After about fifteen minutes, the man came out, and he and the woman got in their car

[3] Barrentine was not able to identify the woman.
[4] McGee was not able to identify the man.

and left, heading toward Albany. McGee testified that after the woman was pushed out of the room, the black man and Jackson were the only ones left in the room. The woman stayed on the ground for several minutes and never went back in the room.

Lorenzo Simpson lived in the room next to Jackson's room at the Dollar Inn. On the night of the incident, Simpson was in his room playing a game when he heard someone say, "B****, what you doing in here?" Simpson then heard someone being struck, and he opened the door to his room. He saw Harrell fall out of the doorway of Jackson's room and begin crying. Simpson then shut his door and went back to playing the game. A couple seconds later, Harrell knocked on Simpson's door and asked him to come over because Floyd and Jackson were fighting. Harrell was saying "Y'all stop. Y'all stop. Somebody is going to get hurt." Simpson came to the door of Jackson's room and saw Jackson push Floyd off of him. Jackson then turned his back to Floyd to go to his sink, and Floyd stabbed Jackson in the back. Floyd came out of the room and said to Harrell, "B****, get up and come on." Floyd and Harrell then drove away.

After Floyd and Harrell left, Simpson went to check on Jackson. When Simpson went into Jackson's room, Jackson was holding his stomach. Simpson called the police and was with Jackson when he died. Simpson remained with Jackson's body until police arrived.

Deedra Johnson, who also lived at the Dollar Inn at the time of the incident, went to the front of the motel to ask the manager some questions that evening. While Johnson was there, she heard someone screaming that Jackson had been stabbed, and she then saw Floyd and Harrell run from Jackson's room and get into a car. According to Johnson, Harrell was driving the car as it left the scene.

On the night of the incident, Timbes was at her mother's house. Late that night, Harrell called her and said that she was on the way to the house and had to tell her something. Harrell, who was driving the car when it arrived, "barged in" the house before Floyd came in. Harrell's mother and Timbes were there, and Harrell told them that Floyd and Jackson had gotten into a fight. Timbes testified that Harrell appeared nervous and scared. According to Timbes, Harrell told her that Floyd killed Jackson, but that she was going to say that

she did it so Floyd would not get in trouble. Harrell told Timbes that Floyd was trying to get her to say that Jackson had punched her in the face and that she stabbed him in self-defense. Timbes testified that Harrell also told her that she stabbed Jackson with a knife. After about 15 to 20 seconds, Floyd came in. He said that he "didn't do it," then walked out of the house. Harrell did not say that Jackson had done anything to her, but she said that Floyd had punched her in the nose.

Floyd and Harrell then left her mother's house and drove away. Their car broke down, and Harrell then walked to a gas station nearby and called her aunt, Debra Thomas. Floyd told Harrell to tell Thomas that she killed Jackson after Jackson hit her in the face. According to Thomas, Harrell said that she had messed up and that she had stabbed Jackson but that she did not know that she had killed Jackson until she went back by the motel and saw the crime scene tape.

Harrell then called Jennifer Blount, Floyd's sister, and asked her to come and pick up Floyd because he was in trouble. According

to Blount, Harrell said to her, "I F-ed up. I went over to the motel to get some child support money, and TV Man and I got into it because he wouldn't give me any money. He punched me in my nose, and I stabbed him."

Walter Floyd, Floyd's brother, testified that on August 14, he received a phone call telling him to look at the television to see what was going on at the Dollar Inn. He called Floyd's phone, and Harrell answered and said, "You are not recording my conversation, are you?" Harrell then said, "That motherf***er hit me in my face, and I stabbed him." According to Walter, Harrell's voice was so "disturbed" that he felt that Floyd was in danger. Walter asked Harrell where they were, and she said that the car broke down and they were on the east side of Albany. Walter met Floyd and Blount at the gas station and drove Floyd to his house. Walter testified that Floyd told him that he and Harrell had gone to the Dollar Inn to try to get child support money from Jackson. When Floyd went into his house, police cars pulled in behind Walter, and officers got out with their guns drawn. Walter and Floyd were then taken to the police

station.

Harrell spent the night at a nearby mobile home park. The next morning, she went across the street to a pawn store. Harrell asked an employee of the store to call 911 and tell the police that she was ready to turn herself in. After that call was placed, Harrell spoke with Tabetha Woodall in the store's parking lot. Woodall asked Harrell what was going on, and Harrell said that she was about to go to jail. When Woodall asked Harrell why, Harrell said that there had been an altercation at the Dollar Inn where someone was stabbed. Harrell also told Woodall that she and Jackson had "got into it" at the motel and that Jackson jumped on her. Harrell then told Woodall that her boyfriend "got involved with the situation" and that "they" — Harrell and her boyfriend — stabbed Jackson. Harrell was arrested later that morning.

Albany Police executed a search warrant at Floyd's and Harrell's residence, and collected a wet plaid shirt and a wet towel from the washing machine. Testing performed on the plaid shirt by a GBI forensic analyst indicated the presence of blood. Albany Police

also collected several items from the floor of Jackson's room, all of which appeared to have blood on them. The police also seized the car Harrell left at the mobile home park and performed a search of it at the police station on August 16. A luminol test in the car yielded a positive reaction indicating the possibility of the presence of blood.

The police interviewed Harrell, Walter Floyd, and Timbes. After being advised of her *Miranda* rights,[5] Harrell told police that she had been at the Dollar Inn and that she had contact with Jackson on the night of the incident. The police investigator did not see any injuries to Harrell's face. In her interview, Timbes indicated that Harrell told her that Harrell stabbed Jackson. Timbes later posted a status on her Facebook account which read, "It's sad. She didn't do it. Floyd did. I know everything that happened." In a later Facebook post, Timbes stated, "I don't know, but she said Floyd did it and that she needed to hide him in my house.  I told him no; she will get out of jail." Walter told police that Floyd told him that he

---

[5] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

had been at the Dollar Inn that night, and that Floyd was standing in the doorway when the incident occurred.

An autopsy revealed that Jackson suffered a stab wound to his lower left chest area, resulting in the penetration of Jackson's pericardial sac and his heart and causing extensive bleeding into his chest cavity. This wound caused Jackson's death. Jackson also had a stab wound on the right side of his back and an incised wound on the third finger of his left hand. The medical examiner testified that the manner of Jackson's death was homicide and that his injuries were consistent with being stabbed with a knife.

Harrell testified on her own behalf. She stated that Floyd wanted her to cover up for him, but she denied that she ever told anyone that she was the person who stabbed Jackson. Floyd did not testify.

Although only Harrell has challenged the sufficiency of the evidence presented at trial, in accord with this Court's practice in

murder cases, we have reviewed the evidence as to both appellants.[6]

In doing so, we view the evidence in the light most favorable to the jury's verdicts. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). The evidence summarized above, while in conflict, authorized the jury to find that Floyd and Harrell both stabbed Jackson, that Floyd stabbed Jackson and Harrell was a party to that act, or that Harrell stabbed Jackson and Floyd was a party to that act. Although the evidence supported a variety of alternative theories of how Jackson's death occurred, the jury was authorized to accept or reject any portion of the testimony presented to it. See *Kemp v. State*, 303 Ga. 385, 388 (1) (a) (810 SE2d 515) (2018). And "[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the

---

[6] Harrell argues that the evidence was insufficient to support the jury's verdicts and that the trial court erred by denying her motion for a directed verdict of acquittal. We reiterate that the test established in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), is the proper standard of review when the sufficiency of the evidence is challenged on appeal, regardless of whether the challenge arises from the denial of a motion for a directed verdict or the denial of a motion for new trial in which the sufficiency of the evidence is challenged. See *Stansell v. State*, 270 Ga. 147, 148 (1) (510 SE2d 292) (1998).

evidence." (Citation and punctuation omitted.) *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017). Accordingly, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find both Floyd and Harrell guilty beyond a reasonable doubt of the crimes of which they were convicted.

2. Floyd argues that the trial court abused its discretion by not granting his motion to sever his trial from that of Harrell. We disagree.

> In a murder case where the death penalty is not sought, the trial court has broad discretion to grant or deny a motion for severance. In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses.

(Citation and punctuation omitted.) *Virger v. State*, 305 Ga. 281, 290 (4) (824 SE2d 346) (2019). See also OCGA § 17-8-4 (a) (providing that in non-death-penalty cases, defendants who are jointly indicted "may be tried jointly or separately in the discretion of the trial

17

court"). "[T]he burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process." (Citation and punctuation omitted.) *Blackledge v. State*, 299 Ga. 385, 388 (2) (788 SE2d 353) (2016).

Prior to trial, Floyd moved to sever the case. He argued that the State planned to introduce statements made by Harrell to law enforcement which incriminated Floyd but did not incriminate Harrell. Floyd argued that severance was appropriate under *Bruton v. United States*, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968), because, if Harrell did not testify at trial, as was her right, Floyd would have no opportunity to cross-examine her about her statements that incriminated him. He also argued that, because he and Harrell were likely to present antagonistic defenses at trial, there was a significant risk that the jury would convict him based solely on Harrell's statements, notwithstanding any instructions given by the trial court regarding the jury's consideration of

18

Harrell's statements.

At the pre-trial hearing on Floyd's motion to sever, the State argued that Harrell's statements at issue inculpated both her and Floyd, as her statements placed her at the scene of the crime at the time of the incident. The State also argued that the *Bruton* issue could be resolved by redacting references to Floyd from Harrell's statements before presenting them to the jury. The trial court ultimately denied Floyd's motion to sever, determining that witnesses who testified regarding statements Harrell made to them would omit any references to Floyd in such statements.

This case involved only two co-defendants, who were tried for the same crimes based on largely the same evidence, and the State's theory was that they acted together to commit the crimes. Thus, there was little likelihood that the issues to be tried would be confused or that evidence against one defendant would improperly be considered against the other. See *Lupoe v. State*, 300 Ga. 233, 242 (2) (c) (794 SE2d 67) (2016).

Floyd also argues that severance was required because he and

Harrell presented antagonistic defenses. He argues that Harrell's testimony was in many ways more damaging to him than the evidence presented by the State. That Harrell presented evidence that implicated Floyd "alone, however, is insufficient to require severance, because unless there is a showing of resulting prejudice, antagonistic defenses do not automatically require a severance." (Citation and punctuation omitted.) *Krause v. State*, 286 Ga. 745, 750 (5) (691 SE2d 211) (2010). Here, although Harrell presented evidence that Floyd stabbed Jackson and that Floyd harbored ill-will against Jackson because of Jackson's relationship with Harrell, Floyd has failed to show that there was any evidence introduced at trial by Harrell that would have been inadmissible had it been introduced by the State. Moreover, the State offered the testimony of three witnesses who placed Floyd (or a man matching his general description) in Jackson's room at the time Jackson was stabbed. One of those witnesses, Simpson, testified to witnessing Floyd stab Jackson. Consequently, although Harrell presented evidence that likely damaged Floyd's case, Floyd has failed to show "any specific

prejudice resulting from antagonistic defenses that would have required the trial court to grant [his motion to sever].” *Virger*, 305 Ga. at 291 (4). See also *Callendar v. State*, 275 Ga. 115, 116 (2) (561 SE2d 113) (2002) (“The mere fact that [a co-defendant] tried to pin the blame on [the appellant] was not sufficient in itself to show a denial of due process.”).

Moreover, severance was not necessary to avoid a *Bruton* violation in this case. “A defendant’s Sixth Amendment right to be confronted by the witnesses against him is violated under *Bruton* when co-defendants are tried jointly and the testimonial statement of a co-defendant who does not testify at trial is used to implicate the other co-defendant in the crime.” (Citation and punctuation omitted.) *Ardis v. State*, 290 Ga. 58, 60 (2) (a) (718 SE2d 526) (2011). However, even assuming that some of Harrell’s statements to other witnesses about Floyd were testimonial in nature,[7] during the State’s case, the trial court instructed witnesses who testified

_____

[7] “A statement is testimonial if its primary purpose was to establish evidence that could be used in a future prosecution.” (Citation and punctuation omitted). *Lord v. State*, 304 Ga. 532, 537 (5) (a) (820 SE2d 16) (2018).

21

regarding conversations they had with Harrell that they should not testify about any statements Harrell made to them regarding Floyd's involvement in Jackson's death. Floyd has pointed us to nothing in the record suggesting that these instructions were not followed. More importantly, after colloquy with the trial court and consultation with her counsel, Harrell elected to testify and was cross-examined by both the prosecutor and Floyd's counsel. Thus, Floyd has failed to show that severance was required in order to avoid a *Bruton* violation.

For the reasons stated above, we see no abuse of the trial court's discretion in denying Floyd's motion to sever. This enumeration of error therefore fails.

3. Floyd argues that the trial court should have instructed the jury regarding self-defense. Because Floyd never requested that the trial court give that instruction as part of its charge to the jury, we review only for plain error. See *State v. Kelly*, 290 Ga. 29, 32 (1) (718 SE2d 232) (2011). See also OCGA § 17-8-58 (b) ("Failure to object [to a failure to charge the jury] shall preclude appellate review of such

22

portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section.").

> [T]o authorize a . . . jury instruction, there need only be slight evidence supporting the theory of the charge. And the defendant need not present evidence to support the theory of an affirmative defense if the State's evidence raises the issue. Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law.

(Citations and punctuation omitted.) *McClure v. State*, 306 Ga. 856 (834 SE2d 96) (2019). With respect to the affirmative defense of justification in the nature of self-defense, OCGA § 16-3-21 (a) provides:

> A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself . . . against such other's imminent use of unlawful force; however, . . . a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself . . . .

23

Importantly, however, OCGA § 16-3-21 (b) provides:

> A person is not justified in using force under the circumstances specified in subsection (a) of this Code section if he . . . [i]nitially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant; . . . [i]s attempting to commit, committing, or fleeing after the commission or attempted commission of a felony; or . . . [w]as the aggressor or was engaged in a combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other, notwithstanding, continues or threatens to continue the use of unlawful force.

There was no evidence presented at trial to support a self-defense instruction. Floyd notes that the State, in its closing argument, argued that the fight between Floyd and Jackson was "not justification . . . not enough to warrant killing someone." Floyd argues that this statement means the State was aware that self-defense was an issue the jury should consider in the case. However, as we have reiterated numerous times, statements made in closing arguments are not evidence. See, e.g., *Gates v. State*, 298 Ga. 324, 328 (4) (781 SE2d 772) (2016) ("[I]t is well settled that closing arguments do not amount to evidence." (citation omitted)). As Floyd

24

has failed to point this Court to any evidence in the record that would have supported an instruction on self-defense, he has failed to demonstrate any error, much less a plain error, on the part of the trial court. See *Reese v. State*, 289 Ga. 446, 448 (2) (711 SE2d 717) (2011) ("[I]t is not error to refuse a justification charge where there is no evidence to support it.").

4. Floyd also argues that he received ineffective assistance from his trial counsel in several regards. To prevail on his claims of ineffectiveness, Floyd

> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Floyd] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Floyd] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citations and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466

U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)).

"A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016). Moreover, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." (Citation and punctuation omitted.) *Davis v. State*, 299 Ga. 180, 183 (787 SE2d 221) (2016). With these principles in mind, we consider each of Floyd's claims of ineffective assistance in turn.

(a) Floyd argues that, although at the close of the State's case, his trial counsel advised him of his right to testify and advised him against doing so, counsel performed deficiently by failing to consult with him and again discuss the advisability of testifying in light of the evidence later presented by Harrell. We disagree.

Here, the record established that, after the State rested, Floyd's trial counsel advised him regarding his right to testify and

that it was inadvisable for him to do so. However, Floyd testified at the hearing on his motion for new trial that, after hearing the testimony of Harrell, Royal, and Grant, he wanted to testify and that he would have done so had he again been advised by counsel that it was his right to do so. Floyd claimed that he and trial counsel never discussed this issue after Floyd initially indicated to the trial court that he would not testify. However, Floyd testified at the hearing on his motion for new trial that he understood that it was his choice alone as to whether he should testify and that he never told his trial counsel that he wanted to testify.

Trial counsel confirmed at the hearing on the motion for new trial that, although she initially advised Floyd that he should not testify, she and Floyd did not discuss this issue again following Harrell's trial testimony. However, trial counsel also testified that her recommendation against testifying would not have changed and that she probably would have attempted to talk Floyd out of testifying had they discussed the issue again. Trial counsel testified that she believed it was unnecessary for Floyd to testify because it

27

would expose him to cross-examination and because trial counsel doubted that the jury would credit Harrell's testimony and that of the witnesses Harrell called.

Although Floyd claims that he would have testified had he consulted with his trial counsel again after Harrell testified, he has not established that trial counsel was deficient by failing to further consult with him about doing so. As we noted in *Thomas v. State*, 282 Ga. 894, 896 (2) (b) (655 SE2d 599) (2008), "[d]efense counsel bears the primary responsibility for advising the defendant of his right to testify and the strategic implications of this choice, as well as for informing the defendant that the decision whether to testify is his to make." However, we went on to note the lack of authority supporting the proposition that this constitutional obligation extends "so as to require counsel to inform a defendant of a 'continuing' right to testify or . . . to re-advise a defendant of the right to testify" after further evidence is presented against him. Id. at 896-897 (2) (b). Although *Thomas* dealt specifically with whether counsel was required to re-advise the defendant of his right to testify after

28

the State presented rebuttal evidence, we see no meaningful distinction between counsel's constitutional obligations in that setting and the case before us, in which the additional evidence was presented by a co-defendant. Therefore, so long as the additional evidence presented against the defendant would not prompt a reasonable defense attorney to provide different advice to the defendant with regard to testifying from that previously given, "[c]ounsel has no duty to re-advise a defendant throughout trial that he has the right to testify." *McDuffie v. State*, 298 Ga. 112, 117 (2) (779 SE2d 620) (2015). Floyd has failed to show that his counsel's performance in regard to advising him of his right to testify was deficient. This claim of ineffectiveness therefore fails.

(b) Floyd argues that his trial counsel performed deficiently by not requesting jury charges on self-defense because there was evidence presented at trial supporting that defense. We disagree.

As we discussed in Division 3 above, Floyd has pointed to no evidence presented at trial that would support the giving of such an instruction. Floyd's trial counsel also testified that she did not

believe the evidence authorized the instruction. Because of the lack of evidence supporting that defense, Floyd's trial strategy was not based on self-defense but was instead that he had no involvement in Jackson's death. Floyd argued that the evidence showed that Harrell asked to go to Jackson's motel room, that Harrell then stabbed and killed Jackson, that Harrell later admitted doing so to several people, and that she denied doing so only after she was arrested. Floyd never argued to the jury that he killed Jackson in self-defense. To the contrary, Floyd claimed that he was not in any way involved in Jackson's death. As Floyd's trial counsel stated in his opening statement, "there was never a confrontation between Mr. Floyd and William Jackson." Floyd's trial counsel pursued this theory by introducing evidence of Floyd's peaceful nature, the difference in physical stature between Floyd and Jackson, and Floyd's history of chronic health problems, all of which, according to Floyd, would make it unlikely that Floyd would have engaged in a fight with Jackson.

Trial counsel's decision about which defense to present is a

matter of trial strategy, and counsel's decision to pursue this defense in this case was not objectively unreasonable, as there was evidence (namely, Harrell's claims of responsibility for Jackson's death) to support his theory that he had not been involved in the crimes. See *Hendrix v. State*, 298 Ga. 60, 62-63 (2) (a) (779 SE2d 322) (2015). Moreover, trial counsel's performance is not deficient for failing to request jury instructions that are not supported by the evidence and which are contrary to the defense strategy. See *Williams v. State*, 292 Ga. 844, 853 (3) (f) (742 SE2d 445) (2013) (counsel's decision not to request instruction on self-defense was not deficient performance where the instruction was inconsistent with the defense theory). Floyd has thus failed to show that his counsel's performance was deficient. This claim of ineffectiveness therefore fails.

(c) Floyd argues that his trial counsel's performance was deficient because counsel should have requested jury charges on the

31

lesser offenses of voluntary manslaughter[8] and affray.[9] However, as noted above, Floyd's trial strategy was to assert that he had no involvement in Jackson's death. That strategy was reasonable. Moreover, in the execution of such a reasonable strategy, a trial counsel's decision not to request jury instructions on a lesser offense in order to pursue an "all-or-nothing defense" is itself a matter of trial strategy. See *Blackwell v. State*, 302 Ga. 820, 824-825 (3) (809 SE2d 727) (2018). Because a request for instructions on voluntary manslaughter and affray would have been contrary to the reasonable defense strategy employed by trial counsel in this case, Floyd has failed to show that his counsel's performance was

---

[8] OCGA § 16-5-2 (a) provides:

A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

[9] OCGA § 16-11-32 (a) provides that an affray is "the fighting by two or more persons in some public place to the disturbance of public tranquility."

deficient. This claim of ineffective assistance therefore fails.

(d) Floyd also argues that his trial counsel provided ineffective assistance by failing to consult with Floyd about requesting jury instructions on the lesser offenses of voluntary manslaughter and affray. However, pretermitting whether trial counsel's performance was deficient because of the failure to do so, Floyd has failed to show that he was prejudiced. Although counsel never discussed this issue with Floyd, Floyd has not shown that, had his trial counsel consulted with him, counsel would have requested instructions on the lesser offenses. Nor has he shown that there is a reasonable probability that pursuit of this alternate strategy would have changed the outcome of the case. See *Blackwell*, 302 Ga. at 826 (3). Floyd has maintained throughout these proceedings, including in his testimony in the hearing on his motion for new trial, that he had no involvement in Jackson's death, and his trial counsel pursued a trial strategy to that effect.[10] Thus, there is no evidence that even if

---

[10] Although in Floyd's testimony at the hearing on his motion for new trial he admitted to going to the Dollar Inn with Harrell the night Jackson was

33

Floyd's trial counsel had consulted with him regarding a request for instructions on the lesser offenses that trial counsel would have pursued a defense other than the "all-or-nothing" strategy pursued at trial, as Floyd continued to maintain that he never engaged in any physical contact with Jackson or stabbed him. Trial counsel did not believe that the evidence warranted instructions on the lesser offenses, and requesting them would have gone against Floyd's trial strategy. Accordingly, Floyd has failed to demonstrate that trial counsel's failure to consult with him about this issue was prejudicial to him. Id. This claim of ineffectiveness therefore fails.

*Judgments affirmed. All the Justices concur.*

DECIDED JANUARY 13, 2020 – RECONSIDERATION DENIED FEBRUARY 10, 2020.
Murder. Dougherty Superior Court. Before Judge Lockette.
*James N. Finkelstein*, for appellant (case no. S19A1493).

---

killed and interacting with Royal and Grant, he continued to maintain that he did not have a weapon that night and that he waited in the car while Harrell went into one of the rooms at the Dollar Inn. Floyd testified that, about three minutes later, he came to the room and told Harrell that they needed to leave. Floyd saw Jackson in the room, bent over at the waist and holding his stomach. Floyd stated that he did not threaten Jackson and that Jackson said nothing to him. Floyd testified that he began pulling Harrell toward the door, and she fell inside the room. Floyd testified that he was not aware that Jackson was injured at the time but that after he and Harrell returned to the car, Harrell drove it away and then told him that she had stabbed Jackson.

*Conger & Smith, Gregory D. Smith*, for appellant (case no. S19A1494).

*Gregory W. Edwards, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.