309 Ga. 212
FINAL COPY

S20A0078.  WILLIAMS v. THE STATE.

BOGGS, Justice.

Appellant Rickey Williams challenges his 2017 conviction for felony murder for the shooting death of Lynett Karim. Appellant contends that the trial court erred in denying his request to instruct the jury on mutual combat and that he was denied the effective assistance of counsel. We affirm.[1]

1.    Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. Appellant and Karim lived in the same apartment complex in Norcross, but in different buildings.

---

[1] Karim was killed on July 3, 2015. On September 16, 2015, a Gwinnett County grand jury indicted Appellant for felony murder and aggravated assault with a deadly weapon. At a trial from May 22 to 26, 2017, the jury found Appellant guilty of both charges. The trial court sentenced Appellant to serve life in prison for felony murder; the aggravated assault verdict merged. On May 30, 2017, Appellant filed a motion for new trial, which he amended with new counsel on July 12, 2018, and again on January 15, 2019. After an evidentiary hearing, on February 7, 2019, the trial court entered an order denying the motion. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2019 and submitted for decision on the briefs.

Appellant lived with his wife of sixteen years and their children in the 1200 building at the front of the complex, and Karim lived with her four-year-old son and her sister in the 600 building at the back of the complex. Two of Karim's friends, Shunteisha Patterson and Juanrico Little, stayed at Karim's apartment for several months, sleeping on separate couches in her living room.

On Thursday evening, July 2, 2015, Appellant went to a gathering held by his downstairs neighbor Vincent Shelton. At some point, Appellant's wife, who was known to carry a pistol when looking for her husband, came down to the party. She showed Shelton her pistol and asked him, "So which one is it that he's messing with? Is it the light-skinned woman?" She was referring to Patterson, who was not there. Shelton replied, "Girl, Rick ain't messing with that girl. Go take that gun back upstairs, girl. There ain't nothing going on with her." Appellant's wife then went back upstairs.

Patterson and Karim's shift at the restaurant where they worked ended at midnight, and they went straight from work to

Shelton's apartment. At around 1:00 a.m. on July 3, Little came to the party, and everyone was talking, drinking, and having fun. For the past few weeks, Appellant and Karim had been having an affair, and Appellant would visit Karim's apartment late at night and go into her bedroom to have sex with her. Sometime before the party, Karim told Little that she wanted to end the affair, and at the party, Little saw Appellant "groping up on" Karim. Based on Karim's reaction, Little could tell that "[s]he didn't like it at all."

At around 3:00 or 4:00 a.m., a woman named Linda and her boyfriend got into a fight. Linda's boyfriend tried to hit her with a bat, she grabbed a steak knife, and Patterson's hand was sliced when she tried to intervene. Patterson wrapped up her hand, and she and Karim went home. Little stayed behind with Appellant and Shelton.

At around 7:00 a.m., Little left for Karim's apartment, and Appellant went with him because Appellant wanted to see Karim. As Little got ready for bed, Appellant walked through the living room to Karim's bedroom, where Karim and her son were asleep.

Appellant tried to get in the bedroom, but the door was locked, and Karim refused to open it, telling Appellant through the door that she was sleeping. Appellant then started banging on the door, and Patterson and Little got up to see what was going on. Patterson told Appellant, "Leave her alone. She's sleeping," but Appellant said, "'F' that" and continued banging on Karim's bedroom door.

Karim eventually came out of the bedroom in her underclothes, went into the living room, and tried to leave the apartment, but Appellant pulled her back. Patterson said, "Hey, leave her alone," and Appellant turned around and "hauled off and smacked" Patterson, knocking Patterson to the floor. Karim was trying to get away and went outside, but Appellant ran behind her. Patterson followed Appellant, and Little, who was in his boxer shorts, followed Patterson. At some point while Appellant was in Karim's apartment, his right shoulder came out of its socket from an old football injury.

Karim got into her SUV. The front windows were down, and Appellant came up to the SUV and punched Karim in the face. Karim started to move the vehicle to get away from Appellant, but

he punched her again as Patterson and Little yelled at him to stop hitting Karim. Appellant threatened to call his wife and get her to bring him a gun so that he could shoot Karim.

For the next ten minutes or so, Karim slowly drove toward the front of the apartment complex as Appellant kept pace with the SUV, arguing with Karim and punching her several more times. Patterson and Little walked along with them, trying to get Appellant to stop hitting Karim and trying to convince Karim to turn around and go back to her apartment. Appellant shoved Patterson and Little when they tried to get between Appellant and Karim.

Allison Daugherty lived in the same building as Karim and was leaving for work with her roommate around 7:30 or 8:00 a.m. when she saw Appellant punching Karim while Karim was in the SUV. Daugherty backed out of her parking space, drove up alongside Karim, and asked if Karim wanted her to call the police. Karim said, "Yes, call the police. Call the police. This MF'er has already hit me in the face." Karim continued to drive forward, and Daugherty called 911. Daugherty then followed behind the SUV, describing for the

911 operator what was happening. At 8:05 a.m., Appellant was standing in a grassy area at a corner across the parking lot from his building when he called his wife and told her to bring him a gun. Karim turned left at the same corner and stopped, continuing to argue with Appellant, and Daugherty pulled into a nearby parking space.

Sonia Tross was such close friends with Appellant's wife and Appellant that she called them "sister" and "brother," and she was asleep on a couch in their living room when Appellant's wife came into the room screaming, "[T]hey're jumping Rickey." Tross followed Appellant's wife out the front door, down the stairs, and up the hill to the corner where Karim and Appellant were arguing. Appellant's wife went toward the grassy area to Appellant, and Tross went to the driver side of the SUV and talked to Karim through the open window.

Tross said, "Lynett, don't pay attention to them, pay attention to me. What's going on?" Karim started to tell Tross what was going on, but as soon as Karim said, "Your brother —," two shots rang out

in quick succession. Appellant had snatched a Kel-Tec nine-millimeter semi-automatic pistol from his wife and opened fire at Karim.

The first shot entered the SUV through the rear driver side window and struck Karim on the left side of her head behind her ear, passing through her cerebellum and lodging in her brain as shattered glass embedded itself in the right side of Tross' face. The second shot entered through the SUV's back door and passed through a backpack before lodging in the back seat. As soon as the first bullet hit Karim, her foot came off the brake, and the SUV started to roll forward. Appellant then fired a third shot but missed the SUV, which rolled down the hill and jumped a curb before crashing into a tree.

John Tucker of the Gwinnett County Police Department ("GCPD") was the first officer to arrive on the scene. Tucker went to the SUV and tried to determine if Karim was still alive, but he could not locate a pulse. Emergency medical personnel arrived, got Karim out of the SUV, and determined that she was dead.

Patrick Reed of the GCPD soon arrived and drove his patrol car up to where Appellant and others were standing. Reed rolled down his window and asked the group if they knew where the shooter went, and everyone looked at Appellant, who raised his left hand and said that he was the shooter. Reed got out of his patrol car, handcuffed Appellant, and put Appellant in the back of the car. Appellant directed Reed to the corner where Appellant left the gun on the grass after shooting Karim.

As Appellant sat in the patrol car, he repeated over and over that "it was self-defense." Appellant claimed that he was up all night playing cards, that a dispute about the game arose, and that the dispute escalated to the point that some people "jumped" him and Karim tried to run him over. Appellant said that he called his wife to save him, that Karim then tried to run over Appellant and his wife, and that he pushed his wife out of the way and shot Karim in self-defense. At some point, Appellant started complaining of a shoulder injury, and Reed asked Appellant whether he wanted medical treatment right away or wanted to wait to speak with a

detective. Appellant decided to wait but changed his mind ten to fifteen minutes later, and Reed took him to a hospital, where Appellant received treatment for his shoulder.

Detective Dallas York, the lead investigator on the case, interviewed Appellant at the hospital later that day. Appellant denied having an affair with Karim and claimed that he went to Karim's apartment at around 7:00 a.m. to make sure that Karim and Patterson got home all right and to check on Patterson's hand. Appellant said that he was running water over the cut on Patterson's hand when Patterson "freaked out" and started hitting him, and that when he went out to the parking lot and tried to walk home, Patterson, Karim, and Little came after him.

According to Appellant, Karim repeatedly tried to run him over as he ducked and rolled out of the way and dodged in and out between parked cars. Appellant said that he could see the headlights of Karim's SUV coming toward him when he pushed his wife out of the way, dove for cover, and shot into the SUV to stop Karim. Appellant admitted during the interview that he called his wife and

said "get your gun," although later in the same interview he stated twice that he did not ask his wife to bring a gun.

Tross, Patterson, Little, and Daugherty testified at Appellant's trial. The State played for the jury Daugherty's 911 call, an audio-recording of Detective York's interview of Appellant, and cell phone video taken by a neighbor who lived in the building directly across from Karim's building that captured part of the prolonged argument between Appellant and Karim. The parties stipulated to the admission of a recorded interview of Tyler Olson, who lived in an adjacent apartment complex separated by a tree line and watched the argument and the shooting through the trees from his patio; the recording was played for the jury.

Anthony Scarbrough, a certified computer forensic examiner with the GCPD, testified that he copied the information contained on Appellant's cell phone, which showed that at 8:05 a.m. on July 3, 2015, a 52-second call was made to the person designated as "wife" in Appellant's cell phone. Numerous photographs and a video showing the path that Appellant and Karim took were shown to the

jury. The parties stipulated that Dennis Miller, a qualified expert in the field of firearms analysis and ballistics, determined that the shell casings at the crime scene and the bullets recovered from Karim's skull and the back seat of her SUV came from the gun that Appellant pointed out to the police.

Appellant did not testify at trial. The defense theory was that Patterson, Little, and Daugherty all lied about what happened, that Appellant was justified in shooting Karim in defense of himself and his wife, and that Appellant at most was guilty of voluntary manslaughter, not murder. The defense called two witnesses, Shelton and patrol officer Trent Greene of the GCPD. Shelton testified that Appellant was so drunk when he left Shelton's apartment that he could not walk without assistance. Greene, one of the first officers to arrive on the scene, testified that Patterson initially did not want to give him her identification or tell him her address and said that she did not know anything about what happened. On cross-examination, Greene said that Patterson was shaking and crying and probably was in shock, and that she kept

saying to him that all she wanted to do was go home.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's usual practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of felony murder for shooting and killing Karim. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Anthony v. State*, 298 Ga. 827, 829 (785 SE2d 277) (2016) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense."); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant contends that the trial court erred in denying

his request for a jury instruction on mutual combat as a basis for voluntary manslaughter. We disagree.

As we recently explained:

> A finding that a defendant was engaged in mutual combat at the time the victim was killed may authorize the jury to find the defendant guilty of voluntary manslaughter and not malice murder. Mutual combat occurs when there is combat between two persons as a result of a sudden quarrel or such circumstances as indicate a purpose, willingness, and intent on the part of both to engage mutually in a fight. Evidence that the victim attacked the defendant, such that would give rise to justification based on self-defense, is not a basis for an instruction on mutual combat.

*Moore v. State*, 307 Ga. 290, 295-296 (835 SE2d 610) (2019) (citations and punctuation omitted).

Appellant argued in the trial court that a jury instruction on mutual combat was warranted because there was evidence that "what we have here is not a duel with two guns or a knife fight, but a car and gun. And both were used as weapons." The trial court instructed the jury on voluntary manslaughter generally but refused Appellant's request to charge the jury on mutual combat, explaining:

I don't think there was . . . any evidence that there's a

mutual agreement to physically fight. I don't think we ever have that. There was clearly a mutual agreement to have a verbal argument. They were clearly both continuing to verbally argue. But . . . I'm not going to give that [i.e., the requested jury instruction on mutual combat].

This was not error. Evidence that Appellant and Karim were arguing shortly before he shot her did not support a jury instruction on mutual combat. See, e.g., *Johnson v. State*, 300 Ga. 665, 669 (797 SE2d 903) (2017) (holding that "evidence of an argument over money that turned violent is not sufficient to show mutual combat" (punctuation omitted)); *Brannon v. State*, 188 Ga. 15, 18-19 (2 SE2d 654) (1939) (holding that testimony that the defendant and his wife "went to cursing" and "started to fight and curse" before the defendant killed her was not sufficient to warrant a jury instruction on mutual combat). Moreover, Appellant claimed that he did not want to fight Karim and instead shot her in self-defense. Evidence of self-defense does not support a jury instruction on mutual combat as a basis for voluntary manslaughter. See *Venturino v. State*, 306 Ga. 391, 398 (830 SE2d 110) (2019) (holding that there was no error

in refusing to charge the jury on mutual combat where the defendant's "own testimony — in which he claimed self-defense — contradicted a theory of mutual combat"); *Tepanca v. State*, 297 Ga. 47, 50 (771 SE2d 879) (2015) (holding that there was no error in refusing to charge on mutual combat where the defendant testified that he did not want to fight the deceased).

In short, there was no evidence from which a jury could find that Appellant and Karim had mutually agreed "to resolve their differences" through an SUV-versus-gun fight. *Carreker v. State*, 273 Ga. 371, 372 (541 SE2d 364) (2001). Accordingly, the trial court did not err in denying Appellant's request to instruct the jury on mutual combat.

3. Appellant also contends that he was denied constitutionally effective assistance of counsel. In order to show that his attorney's assistance was so defective as to require reversal of his conviction, a defendant must prove both that his attorney's performance was professionally deficient and that this deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466

U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, the defendant must show that his counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This burden, though not impossible to carry, is a heavy one." *Ellis v. State*, 292 Ga. 276, 283 (736 SE2d 412) (2013). See *Kimmelman v. Morrison*, 477 U.S. 365, 381-382 (106 SCt 2574, 91 LE2d 305) (1986). Appellant has not carried that burden.

Appellant claims that his trial counsel was professionally deficient in failing to adequately advise him about his right to testify and in failing to obtain a decision from him about whether he wanted to testify. However, at the motion for new trial hearing, Appellant acknowledged that his trial counsel explained to him that he had the

right to testify, that he told his counsel that he "would think about it," and that he never told his counsel (or anyone else) that he wanted the jury to hear from him. His trial counsel also testified and said that as a matter of course, he "always" discusses with his clients their right to testify, and that he would have discussed with Appellant his right to testify "at various points" before and during the trial. Counsel also said that he has never prevented a client who expressed a desire to testify from testifying, and that if Appellant had told him that he wanted to testify, counsel would not have prevented Appellant from doing so. Based on the testimony at the hearing and the trial record, the trial court found that Appellant was advised of his right to testify and clearly understood that he would have the right to testify on his own behalf if he so chose, that Appellant had ample opportunities to tell his counsel that he wanted to testify, and that there was absolutely no evidence that his counsel had prevented him from taking the stand and testifying.

The record supports the trial court's finding that Appellant failed to carry his burden to show deficient performance. Trial

counsel has no professional obligation to continually advise his client that he has the right to testify in his own defense. See *Floyd v. State*, 307 Ga. 789, 801 (837 SE2d 790) (2020); *Thomas v. State*, 282 Ga. 894, 896-897 (655 SE2d 599) (2008). A client who fails to inform his counsel that he wishes to testify after being advised of his right to do so has no one but himself to blame. See *Gibson v. State*, 290 Ga. 6, 11-12 (717 SE2d 447) (2011). Accordingly, Appellant's ineffective assistance of counsel claim fails.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 29, 2020.
Murder. Gwinnett Superior Court. Before Judge Conner.
*Lynn M. Kleinrock*, for appellant.
*Daniel J. Porter, District Attorney, Lee F. Tittsworth, Daniel Sanmiguel, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.