NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 14, 2024

S24A0528.  FEDER v. THE STATE.

BETHEL, Justice.

Visheslav Feder was convicted of felony murder and other crimes in connection with the shooting death of Avery Birthrong.[1] On appeal, Feder contends that his acquittal for the aggravated

---

[1] The crimes occurred on July 17, 2018. On October 24, 2018, a Gwinnett County grand jury indicted Feder for felony murder predicated on the aggravated assault of Avery Birthrong (Count 1); aggravated assault of Birthrong (Count 2); aggravated assault of Laurence Parks (Count 3); aggravated assault of John Durden (Count 4); and possession of a firearm during the commission of a felony (Count 5). Following a trial held from January 31 to February 7, 2022, the jury found Feder not guilty of the aggravated assault of Parks (Count 3), but guilty of felony murder (Count 1) and the remaining counts (Counts 2, 4-5). The trial court sentenced Feder to serve life in prison without the possibility of parole on Count 1, twenty years in prison on Count 4 to be served consecutively to Count 1, and five years in prison on Count 5 to be served consecutively to Count 1; Count 2 merged into Count 1.

Feder filed a timely motion for new trial, which was later amended through new counsel. Following a hearing on June 28, 2023, the trial court denied the amended motion on November 7, 2023. Feder then filed a timely notice of appeal, and his case was docketed to the April 2024 term of this Court and submitted for a decision on the briefs.

assault of Laurence Parks means that he should not have been convicted for the felony murder and aggravated assault of Birthrong or the aggravated assault of John Durden because the verdicts are repugnant. Feder also argues that his trial counsel rendered ineffective assistance by failing to file a motion to suppress evidence recovered during a search of Feder's cell phone. However, the verdicts were not illogical and were, at most, inconsistent rather than repugnant, which is not a basis for reversal. And the ineffective assistance claim fails because Feder has failed to establish that his trial counsel's decision not to file a motion to suppress was deficient. Accordingly, we affirm.

1. The evidence presented at trial showed the following. In June 2018, Avery Birthrong borrowed between sixty and seventy dollars from Feder to bail her boyfriend, Laurence Parks, out of jail. Birthrong offered to repay Feder in small increments, but he refused, stating that he wanted the money back all at once. When Birthrong and Parks were unable to repay the entire amount, Feder began threatening them and making threats about them to others.

Feder told Erica Lenity, a mutual friend, that he "would kill [Parks and Birthrong]." Lenity testified that Parks "swore on his kid's life that he would pay [Feder] back," and that Feder told Lenity, "I can't find his kid but I can find him." Feder also tried to have Lenity "set up" Parks and Birthrong by inviting them to her house where Feder would then confront them, but Lenity refused and instead warned Birthrong and Parks. Additionally, Feder sent Margaret Caldwell, his girlfriend at the time, emails while she was incarcerated, stating, "[W]e need to talk about your friends. They are going to make me introduce them to another me they don't know about." In a recorded phone call between Caldwell and Feder, Feder said, "I'm going to f***ing beat the s**t out of [Parks,] and I'm more likely going to stab. . . [Birthrong]." Feder continued sending threatening text messages to Birthrong and Parks, and Parks used Birthrong's phone to respond.

Meanwhile, Feder learned from Jeanara Bandy that Birthrong had contacted her friend, John Durden, to obtain methamphetamine, and that Durden was with Parks and Birthrong.

3

Feder remarked that he had just bonded Parks out of jail and that Parks was trying to buy drugs instead of paying him back the money he owed. Feder and Bandy then began driving toward Durden's home. Feder texted Parks, "Just don't run brah okay," and, "[H]ere I come."

Meanwhile, Parks and Birthrong picked up Durden from his home. About one mile from Durden's home, when they were stopped at a red light at an intersection, Durden and Parks heard "peeling tires," and Parks saw Feder's truck run a red light and make a "crazy u-turn" in their direction. Inside his truck, Feder exclaimed to Bandy, "that's the mother f***er right there" before turning around to follow the vehicle containing Birthrong, Parks, and Durden. When Feder's truck pulled alongside the vehicle, Parks saw Feder pointing a gun at him. Parks responded by drawing Birthrong's gun from beneath the seat and pointing it at Feder. Feder and Parks exchanged words, and then Parks fired one shot at Feder and immediately turned right because he "wasn't going to wait to see if [Feder] was going to shoot [him] or not[.]"Parks did not hear any

return fire until "maybe like five, ten seconds" after making the right turn. On cross-examination, Parks emphasized that Feder "didn't shoot before [Parks] turned" and that he did not hear shots fired by Feder until after he "had already made the right." Although Durden saw only the initial gunshot at the intersection because he ducked down in his seat, he heard the shooter say, "I got you now," and then heard three to five additional gunshots. Shortly after fleeing the intersection,[2] Durden noticed that Birthrong had been shot. Feder subsequently texted Parks, "Found your b***h a*s." Parks responded, "You killed [A]very." Birthrong died as a result of a gunshot wound to the left side of her head, which a crime scene specialist determined to have been fired from outside the vehicle.

After the shooting, Feder drove away from the scene and threw his firearm out of the vehicle's window. Bandy testified that, after this and, "not long after the incident," Feder got into a different vehicle.

---

[2] The events at the intersection were captured on surveillance footage from a nearby convenience store, which was shown to the jury; the footage showed Feder's vehicle pull alongside Parks' vehicle before Parks sped off.

After learning from Parks and Durden that Feder had been involved in the shooting, the police obtained Birthrong's cell phone because Parks told them that he used it to communicate with Feder. Investigators also obtained Birthrong's phone records and were able to review text messages between Birthrong's phone and Feder's phone.

Feder was arrested in Arkansas, and two cell phones were seized from his vehicle. The text messages sent from Feder's phone to Birthrong's phone were introduced at trial. Feder argued at trial that he was justified in shooting at the vehicle because he only did so after he was fired upon first.

2. In his first enumeration of error, Feder argues that he is entitled to a new trial because the jury's verdicts were repugnant. As noted in footnote 1, supra, Feder was charged with three counts of aggravated assault based on firing his weapon at Birthrong (Count 2), Parks (Count 3), and Durden (Count 4), who were all passengers in the same vehicle at the time Feder fired at the vehicle. The jury found Feder not guilty of the aggravated assault of Parks,

6

but guilty of the aggravated assaults of Birthrong and Durden. On appeal, Feder contends that because the jury found him not guilty of the aggravated assault of Parks (Count 3), the jury must have found that he did not fire his weapon at the vehicle in which all three victims were passengers.[3] He argues that because the jury made this finding, the jury could not logically or legally find him guilty of the felony murder of Birthrong (Count 1) or the aggravated assault of Durden (Count 4) because those counts were premised on Feder's firing his weapon at the vehicle in the same transaction. We disagree.

"Repugnant verdicts occur when, in order to find the defendant not guilty on one count and guilty on another, the jury must make *affirmative* findings shown on the record that cannot logically or legally exist at the same time." *State v. Owens*, 312 Ga. 212, 216 (1) (b) (862 SE2d 125) (2021) (cleaned up). When verdicts are

---

[3] In his brief, Feder incorrectly identifies Count 3 as charging the aggravated assault of Durden. Our review of the record shows that Count 3 charged Feder with the aggravated assault of Parks, not Durden.

7

repugnant, they must be vacated.[4] See id. By contrast, "inconsistent verdicts occur when a jury in a criminal case renders seemingly incompatible verdicts of *guilty* on one charge and *not guilty* on another." *McElrath v. State*, 308 Ga. 104, 108 (2) (a) (839 SE2d 573) (2020) (emphasis in original). "We have abolished the rule that inconsistent verdicts require reversal." Id. "Inconsistent verdicts are permitted to stand because the jury's rationale is not apparent from the record and courts generally are not permitted to make inquiries into the jury's deliberation process." *Owens*, 312 Ga. at 216-217 (1) (b).

Here, the verdicts are at most inconsistent, as the record does not reflect any affirmative finding by the jury that Feder did not fire his weapon at the vehicle containing Durden, Parks, and Birthrong. Compare *Guajardo v. State*, 290 Ga. 172, 174 (2) (718 SE2d 292)

---

[4] We question the continuing validity of our repugnant verdict caselaw in the wake of the United States Supreme Court's decision in *McElrath v. Georgia*, 601 U. S. 87, 95-96 (144 SCt 651, 217 LE2d 419) (2024). However, we need not decide that issue here, as these verdicts are not repugnant and the parties did not raise the ongoing validity of our repugnant verdict case law. See *Ward v. State*, No. S24A0352, 2024 LEXIS 100, 2024 WL 1862343, at *9 (2) n.12.

(2011) (repugnant verdicts require reversal "in the rare instance where, instead of being left to speculate as to the jury's deliberations, the appellate record makes transparent the jury's rationale"). In the absence of such an affirmative finding, determining the precise basis for the jury's not guilty verdict on Count 3 "would be based either on pure speculation, or would require inquiries into the jury's deliberation that the courts generally will not undertake." *Carter v. State*, 298 Ga. 867, 868-869 (785 SE2d 274) (2016) (citation and punctuation omitted). We "cannot know and should not speculate why a jury acquitted on one offense and convicted on another offense. The reason could be an error by the jury in its consideration or it could be mistake, compromise, or lenity." *Turner v. State*, 283 Ga. 17, 20 (2) (655 SE2d 589) (2008) (citation and punctuation omitted). Accordingly, Feder's claim fails.

2. Feder next argues that trial counsel provided ineffective assistance by failing to file a motion to suppress evidence recovered during a search of the cell phones found in his vehicle. More specifically, Feder argues that trial counsel should have moved to

9

suppress his cell phone records because his phone was seized without a warrant, without his consent, and without exigent circumstances. He also asserts that the later-obtained search warrant was overbroad and not particularized to the items to be seized from the phones. Feder argues that, had trial counsel filed the motion, "damaging evidence" would have been suppressed, though Feder does not specify what that evidence was.

> To prevail on his claim of ineffective assistance, Feder
>
> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [an appellant] must show that his trial counsel acted or failed to act in an objectively reasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [an appellant] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

*Floyd v. State*, 307 Ga. 789, 799 (4) (837 SE2d 790) (2020) (citation and punctuation omitted). "When trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance,

the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." *Santana v. State*, 308 Ga. 706, 712 (3) (a) (842 SE2d 14) (2020).

In evaluating whether trial counsel's performance was deficient, "our inquiry is focused on the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Davis v. State*, 306 Ga. 140, 143 (3) (829 SE2d 321) (2019) (citation and punctuation omitted). When evaluating counsel's reasonableness, we consider "the attendant circumstances of the challenged conduct" and judge "from counsel's perspective at the time with every effort made to eliminate the distorting effects of hindsight." Id. at 144 (3) (citation and punctuation omitted).

> The law recognizes a strong presumption that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. To carry this burden, [an appellant] must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not.

*Evans v. State*, 315 Ga. 607, 611 (2) (b) (884 SE2d 334) (2023)

(citations and punctuation omitted).

Based on the record before us, Feder has failed to prove that trial counsel's performance was deficient. The record makes clear that trial counsel made the strategic decision not to move to suppress the cell phone records. Though Feder does not detail what "damaging" evidence in these records should have been suppressed, trial counsel testified at the hearing on the motion for new trial that, "to the extent there was anything harmful on the phones," that same evidence was also recovered from Birthrong's phone, so filing a motion to suppress "wouldn't have made any difference." In fact, investigators were able to obtain Birthrong's phone records through a separate search warrant and review the text exchanges between Feder, Birthrong, and Parks, even before they applied for a search warrant for Feder's phone. Although these records were not admitted into evidence at trial, they showed the same text exchanges, which an investigator testified was "verbatim," between the parties as that which was admitted into evidence from Feder's phone records. Accordingly, even if Feder had succeeded on a motion

to suppress his cell phone records, the State easily could have remedied the problem by moving to admit into evidence Birthrong's cell phone records. Therefore, it was reasonable for trial counsel not to raise a motion to suppress. See *Washington v. State*, 313 Ga. 771, 774 (3) (b) (873 SE2d 132) (2022) (appellant failed to show that counsel performed deficiently by failing to object to evidence on foundation grounds where appellant failed to argue, much less demonstrate, that the State could not have provided additional foundational support for the admission of the evidence if his counsel had objected). Moreover, Feder has not established that he would have had standing to challenge the admissibility of the identical records from Birthrong's phone, nor does he make any other argument as to why those records would not have been admissible. See *Davis*, 301 Ga. at 406 (6) (c) (holding that defendant lacked standing to challenge admission of cell phone records obtained from service provider where the defendant "provided no evidence that he had any legal link to the account, much less any ownership interest in it; nor has he shown that he was an authorized user on the

account, or the de facto exclusive, primary, or customary user of the cell number of issue" (citation and punctuation omitted)); *Hampton v. State*, 295 Ga. 665, 669-670 (2) (763 SE2d 467) (2014) (same). See also *Rakas v. Illinois*, 439 U. S. 128, 130 (1) n.1 (99 SCt 421, 58 SE2d 387) (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). And Feder does not specify what other "damaging evidence," if any, was collected from the search of his phone and admitted against him at trial.

Feder's trial counsel also conceded that some of the text messages were, instead, advantageous to Feder's self-defense claim because they showed Parks's "challenging statements" to Feder and "history of hostility" toward Feder. Feder's counsel argued at trial that Feder was acting in self-defense after Parks shot at him and that Parks had "talked trash back and forth" and had "bad intentions." It was not objectively unreasonable for counsel to highlight the ways in which the text messages supported Feder's justification defense, rather than move to suppress them.

Because the decision not to seek a motion to suppress was not objectively unreasonable under the circumstances, it cannot form the basis of a claim of ineffective assistance of counsel. See *Thomas v. State*, 311 Ga. 280, 286 (2) (857 SE2d 223) (2021) (identifying no deficient performance where counsel chose to withdraw a motion to suppress and to "vigorously pursue a self-defense theory at trial and to characterize any evidence at her disposal in any way that could advance that theory"); *Reyes v. State*, 309 Ga. 660, 671 (3) (a) (847 SE2d 194) (2020) (identifying no deficient performance where counsel could reasonably determine that the best defense strategy was to forgo a motion to suppress DNA evidence and offer a plausible explanation for its presence at the crime scene). Thus, Feder's final claim fails.

*Judgment affirmed. All the Justices concur.*