**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0057
Deqaveon Malcolm
v.
The State

On Appeal from the Superior Court of Fulton County
No. 16SC147899

Argued: December 9, 2025 — Decided: April 21, 2026

MCMILLIAN, Justice.

Deqaveon Malcolm appeals from his convictions for felony murder, aggravated assault, and other crimes in connection with the shooting death of James Simmons and injury to Trevis Bufford.[1] Malcolm asserts that (1) the evidence was insufficient as a

---

[1] The crimes were committed on April 7, 2016. In November 2016, a Fulton County grand jury indicted Malcolm for two counts of participation in criminal street gang activity (Counts 1 and 9), malice murder (Count 2), three counts of felony murder (Counts 3-5), two counts of aggravated assault with a deadly weapon (Counts 6-7), criminal damage to property in the first degree (Count 8), robbery by force (Count 10), aggravated assault (Count 11), and two counts of possession of a firearm during the commission of a felony (Counts 12-13). At a jury trial held from July 31 to August 6, 2018, Malcolm was found guilty of one count of criminal street gang activity (Count 1), two counts of felony murder (Counts 3-4), two counts of aggravated assault with a deadly weapon (Counts 6-7), and criminal damage to property in the first degree (Count 8); he was acquitted of the remaining counts. The trial court sentenced Malcolm to serve life in prison for felony murder (Count 3), a concurrent ten-year term in prison for participation in criminal street gang activity (Count 1), and a concurrent twenty-year term in prison for aggravated assault of Bufford

matter of constitutional due process; (2) trial counsel rendered ineffective assistance by failing to file a motion to suppress evidence obtained from a search of Malcolm's mother's car; and (3) the trial court abused its discretion in failing to remove a juror. Because the evidence was sufficient as a matter of constitutional due process, trial counsel had an objectively reasonable trial strategy in forgoing a motion to suppress, and the trial court did not abuse its discretion in allowing the contested juror to remain, we affirm.

The State's theory was that Malcolm and Jamon Freeman[2] committed a drive-by shooting directed at Simmons and Bufford in retaliation for their having shot Malcolm's girlfriend's car. The evidence introduced at trial[3] showed that Malcolm and Freeman were both members of "Bird Gang," a subset of the Bloods gang. On April 7, 2016, Simmons and Bufford went to an apartment complex in Atlanta.[4] That apartment complex, where Malcolm

---

(Count 7); the remaining counts either merged for sentencing purposes or were vacated by operation of law. We express no opinion on whether the conviction for criminal damage to property in the first degree was properly merged with the felony murder conviction. Malcolm timely filed a motion for new trial, which was amended in January 2020, June 2022, and January 2024. Following an evidentiary hearing in June 2024, the trial court denied the motion for new trial, as amended, on August 26, 2024. Malcolm timely filed a notice of appeal, and his case was docketed to the term of this Court beginning in December 2025. The case was orally argued on December 9, 2025.

[2] Freeman later died in an unrelated motor vehicle accident before the trial of this case.

[3] Because this case involves questions of prejudice under *Strickland v. Washington*, 466 US 668 (1984), the trial evidence is described in some detail rather than only in the light most favorable to the jury's verdicts. See *Asmelash v. State*, 323 Ga. 33, 34 n.2 (2025).

[4] At trial, Bufford denied that he was there to see his girlfriend, claiming instead that he was there to see his cousin, who is also Malcolm's sister. However, the day after the shooting, Bufford gave multiple inconsistent statements to detectives, including that he was there to see his girlfriend.

also lived, was a location where the Bloods gang had a large presence and was considered Bloods "territory."

While walking on the sidewalk outside the apartment complex, Bufford passed by Malcolm, who is Bufford's cousin, and Freeman around 7:00 p.m. A fight ensued between Freeman and Bufford when Freeman tried to take a gun that was tucked in Bufford's waistband.[5] During the scuffle, which was captured on the apartment complex's surveillance video, both Bufford's gun and Freeman's gun fell to the ground. Although he equivocated at trial, Bufford previously told detectives that Malcolm picked up both dropped guns and ran away with Freeman, which is corroborated by the surveillance video.

Using Simmons's phone, Bufford began repeatedly calling Malcolm and asking for the gun back, and Malcolm initially said that he would try to get the gun back to him. In the meantime, Bufford and Simmons went to Bufford's father's home, where they retrieved two guns. Bufford continued calling Malcolm, but Malcolm eventually told Bufford that he would not give him back the gun. Within minutes of arriving back at the apartment complex at approximately 8:20 p.m., Simmons exited his car, with a dark shirt over the white shirt he had just been wearing, and Bufford slid into the driver's seat. When Bufford later spoke with detectives, he said that Simmons took a Glock with him when he got out of the car. Although not captured by the apartment complex's surveillance video, someone fired multiple gunshots at a Ford Explorer that Malcolm had been driving earlier that day. The Explorer was owned by Malcolm's girlfriend.

Simmons and Bufford left the apartment complex at 8:23 p.m. with Simmons driving. Malcolm's mother and girlfriend each

---

[5] Bufford testified that the gun had belonged to Simmons.

3

called Malcolm between 8:22 and 8:24 p.m. Just minutes later, as Simmons and Bufford were traveling down Sawtell Road, Bufford noticed a dark-colored vehicle following them. As they approached the intersection with Jonesboro Road, which is less than two miles from the apartment complex, the dark-colored vehicle pulled up next to their car. Bufford saw Freeman lean out of the car window and fire multiple shots towards them.

Simmons, who was struck by multiple bullets, crashed the car into a pawnshop located at the intersection. Bufford exited the vehicle and attempted to hide the two guns they had taken from his father's house behind the pawnshop before returning to check on Simmons. Several witnesses called 911 and attempted to render aid to Simmons,[6] but he died as a result of multiple gunshot wounds to his torso. Bufford, who was shot twice, was transported to a hospital to receive medical care for his injuries.

Law enforcement officers were able to locate the two guns that Bufford hid behind the pawnshop, as well as six .40-caliber shell casings. One of the guns recovered from behind the pawnshop matched the ballistic evidence collected from the shooting of the Explorer at the apartment complex. Officers also obtained the pawnshop's surveillance video, which showed that the shooters were in a black, four-door car with chrome handles and a missing hubcap on the front passenger side. Officers provided the video of the car to local newscasts, seeking the public's assistance in identifying the shooters.

Officers eventually learned that Malcolm's mother owned

---

[6] Although the witnesses heard the gunshots, and some saw both a white car and a dark car at the intersection, none was able to identify any individuals in the dark car.

4

a black Nissan Sentra with chrome handles and a missing hub-cap. By the time officers examined the vehicle on May 26, 2016, the tire with the missing hubcap was on the front driver's side; however, the vehicle had damage on the front passenger side that was consistent with having struck something near the front passenger fender. A subsequent search of the vehicle revealed the presence of one particle of gunshot residue ("GSR").

Officers obtained Malcolm's cell phone records, and cell-site location data showed that at the time Malcolm's girlfriend and mother called his cell phone after the shooting of the Explorer, Malcolm's cell phone had been moving towards the apartment complex but then turned in the direction of where the drive-by shooting occurred. The cell-site location data then placed Malcolm's cell phone in the area of the drive-by shooting at the time that the shooting occurred.

Three weeks after the incident, on April 28, 2016, an Atlanta Police Department officer conducted a traffic stop of a black Chevy Camaro. During the traffic stop, the officer discovered that Freeman was driving alone with only a learner's permit. Freeman was taken into custody, and the vehicle was impounded. Pursuant to an inventory search of the Camaro, a loaded .40-caliber Glock 23 semi-automatic handgun was found between the center console and the passenger seat. Later testing confirmed that the firearm recovered from Freeman's car matched the six casings collected at the scene of the drive-by shooting, as well as a bullet recovered from Simmons's body during his autopsy.

1. Malcolm first asserts that the evidence was insufficient as a matter of constitutional due process to support his convictions because Bufford, the State's primary witness, contradicted himself on the stand and because the presence of Malcolm's cell phone in the area at the time of the shooting showed only mere

5

presence and is not enough for a reasonable jury to find him involved in the shooting. We disagree.

In evaluating this claim, we view all the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 US 307 (1979). And in reviewing the evidence, "we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury." *Ridley v. State*, 315 Ga. 452, 455 (2023).

Here, the evidence supported that Malcolm was involved in the altercation that led to the shooting of his girlfriend's car; that Malcolm participated in the shooting of Simmons and Bufford in retaliation; and, thus, was sufficient to support Malcolm's convictions as a party to the crimes. See *Grant v. State*, 319 Ga. 490, 493 (2024) ("[A] jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with other perpetrators before, during, and after the crimes." (citation and punctuation omitted)). Specifically, surveillance video showed Malcolm take both dropped guns during the fight between Bufford and Freeman. Cell phone records also corroborated Bufford's account that he tried to convince Malcolm to return the gun and that very shortly after Malcolm refused to do so, the Ford Explorer associated with Malcolm and his girlfriend was shot. Immediately after the shooting of the Explorer, Malcolm's mother and girlfriend called Malcolm's cell phone. After receiving those calls, Malcolm's cell phone switched directions and headed to the intersection where the drive-by shooting occurred just moments later. Bufford identified Freeman as the shooter, which was corroborated by ballistic evidence matching a gun later recovered

from Freeman's vehicle. The car seen in the pawnshop video matched that of Malcolm's mother, and a search of that car revealed the presence of GSR. And the State's gang expert's testimony showed that Malcolm and Freeman were associated with the Bloods gang and that retaliating for the shooting of the Explorer in Bloods territory would be an act in furtherance of the gang's interests to not appear "soft."

This evidence was constitutionally sufficient to authorize a rational trier of fact to find Malcolm guilty beyond a reasonable doubt of the crimes of which he was convicted, at least as a party to the crimes. See *Muse v. State*, 316 Ga. 639, 648–49 (2023) (although no witness specifically identified appellant at the scene of the shooting, evidence was sufficient to sustain his murder conviction as a party to the crime even if he did not fire the gun); *Rosenua v. State*, 321 Ga. 299, 304-05 (2025) (evidence was sufficient to sustain criminal street gang conviction where testimony showed that appellant was associated with a gang and committed an aggravated assault with a deadly weapon in order to further the gang's interests).

2. Malcolm asserts that his trial counsel rendered constitutionally ineffective assistance by failing to file a motion to suppress evidence recovered from the search of Malcolm's mother's car. Specifically, Malcolm argues that he had standing to contest the search of his mother's car; that trial counsel knew he had standing; that the search of the car exceeded the scope of the search warrant; and that the evidence recovered would have been excluded had trial counsel moved to suppress it.

For Malcolm to prevail on this claim, he must show both that his trial counsel performed deficiently and that he was prejudiced by counsel's deficient performance. See *Strickland v.*

7

*Washington*, 466 US 668, 687 (1984). To establish deficient performance, Malcolm "must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Taylor v. State*, 315 Ga. 630, 647 (2023) (punctuation omitted). "The law recognizes a strong presumption that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption." *Evans v. State*, 315 Ga. 607, 611 (2023) (citation and punctuation omitted). To carry that burden, Malcolm must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (punctuation omitted). And to establish prejudice, Malcolm "must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Floyd v. State*, 307 Ga. 789, 799 (2020). Should Malcolm fail to make a showing on either prong of the *Strickland* test, we need not address the other. See id.

Here, the lead detective sought and obtained a warrant to seize Malcolm's mother's vehicle. After the vehicle was seized, the detective obtained a second warrant to search the vehicle, which permitted a search of the vehicle for "ballistic evidence such as cartridge cases, bullets, and guns. Also search the car for Gun Shot Residue (GSR) by taking samples from the roof lining on the front and rear passenger side. The evidence collected will be submitted to the GBI for further analysis." GSR samples were collected from the vehicle, and one sample—labeled as collected from the back driver's side of the vehicle—tested positive for a single particle of GSR.

At the motion for new trial hearing, Malcolm testified that he had complete access to his mother's vehicle whenever he

wanted to and that his trial counsel was aware of this fact. However, this testimony was directly contradicted by Malcolm's mother's pre-trial statements and testimony at trial. The search warrant affidavit states that Malcolm's mother told the detective that "she does not let her son drive the car because he 'tear[]s' them up." And at trial, Malcolm's mother testified that the car was routinely used by her fiancé and that she told the detective that her fiancé drove her car every day to go back and forth to his job, including on the day of the drive-by shooting.

Although trial counsel could not recall why he did not file a motion to suppress challenging the search of the vehicle, we are not limited to counsel's subjective recollection and instead focus on whether it was an objectively reasonable trial strategy to forgo a motion to suppress under the circumstances. See *Davis v. State*, 306 Ga. 140, 143 (2019) (in evaluating whether counsel's performance was deficient, "our inquiry is focused on the objective reasonableness of counsel's performance, not counsel's subjective state of mind" (punctuation omitted)). In this case, had trial counsel filed a motion to suppress, Malcolm would have had to overcome his mother's pretrial statement that she did not permit him to drive her car, which was consistent with her later trial testimony, in order to establish standing to challenge the search. See *Lowe v. State*, 295 Ga. 623, 626 (2014) ("[A]lthough the burden of proving that the search and seizure were lawful shall be on the State, the defendant bears the burden of proof where his or her standing to raise a challenge to the legality of a search or seizure is contested by the State." (cleaned up)). Moreover, based on Malcolm's testimony at the motion for new trial hearing that his friends preferred to ride around in his mother's car, the State would have been allowed the opportunity to question Malcolm about the identity of those friends and potentially call them as witnesses at trial to more thoroughly link Malcolm to the vehicle

9

used in the shooting. Such evidence may have been more prejudicial to Malcolm's case than the single particle of GSR found in the backseat of the vehicle months after the incident.

Given these circumstances, it was reasonable for trial counsel to instead attack the evidence during trial, as Malcolm's counsel did here. During cross-examination, trial counsel was able to elicit testimony from the State's expert that the sample was collected more than two months after the shooting and that he could not determine when the single GSR particle was deposited onto the surface from which it was collected. The expert further conceded that the presence of GSR in a vehicle does not necessarily mean a gun was fired in the vehicle and that the gun could have been fired outside the vehicle and the residue transferred from the individual's hand to the vehicle. Malcolm's trial counsel specifically posited the following hypothetical to the expert witness:

> Q. So, I want to give you a hypothetical and tell me if this could result in GSR ending up in a vehicle. Okay?
>
> A. Okay.
>
> Q. Individual goes to a firing range. They fire a gun. They then go out to their car and they touch the inside of their car, without having washed their hands or done anything else between firing the gun and making it to the car.
>
> A. Yes, that is possible.

And during his direct examination of Malcolm's mother, trial counsel established that she was doing "security" work, and

as part of her job duties, she had to carry a firearm. She also testified that she had to go to a gun range "every so often" and that she took her car to and from those gun ranges.

Because it was a reasonable trial strategy to avoid the risks associated with filing a motion to suppress and instead argue that only a single particle of GSR was found, that it was impossible to determine when it was deposited, and that it could have come from Malcolm's mother, who shot guns at a firing range and used the vehicle during the relevant time period, Malcolm has not shown that trial counsel performed deficiently. See *Feder v. State*, 319 Ga. 66, 70, 72 (2024) (noting that when failure to file a motion to suppress is the basis for a claim of ineffective assistance, "the defendant must make a strong showing that the damaging evidence would have been suppressed" and concluding that it was "not objectively unreasonable for counsel to highlight the ways in which the text messages supported [Appellant's] justification defense, rather than move to suppress them"); *Reyes v. State*, 309 Ga. 660, 671 (2020) (concluding performance was not deficient where counsel could reasonably determine that best strategy was to forgo a motion to suppress DNA evidence and offer a plausible explanation for its presence at the crime scene).

3. Malcolm also asserts that the trial court abused its discretion by refusing to remove a juror based on her failure to disclose during voir dire that she was a victim in a pending Fulton County criminal case.

The record shows that at the conclusion of the third day of trial, the prosecutor informed the trial court that she had learned Juror No. 7 was a victim in a Fulton County criminal case and that the juror had been "in pretty regular contact" with victim-

witness advocates from the District Attorney's Office.[7] During voir dire, however, Juror No. 7 had not responded when the prosecutor had asked whether anyone had "a case" in Fulton County or when Malcolm's trial counsel asked whether potential jurors "knew anyone in the D.A.'s Office." The State asked that the trial court excuse Juror No. 7 "based on her failure to answer those questions."[8]

The trial court took the matter up the next morning, questioning Juror No. 7 individually about her case and her ability to proceed. The trial court apologized for her not being able to attend the plea hearing in the case in which she was a victim and asked that she hold that against the trial court, rather than the parties. The trial court then asked whether there was anything about her experience in dealing with that case as a victim that made her have any animosity or ill feelings towards the District Attorney's Office. The juror confirmed that she did not and responded that there was "no reason" why she could not "continue to be fair and impartial in this case." After the juror was excused, the prosecutor explained that her primary concern was Juror No. 7's failure to respond to pertinent questions before trial.

Malcolm's trial counsel responded, "I have to join in with [the prosecutor's] request to have her removed. I don't have a choice but to state that for the record. I understand the court's ruling, I understand the court's query of the juror, but I have to

---

[7] Malcolm concedes on appeal that the prosecutor had no actual knowledge about the juror's connection with the Fulton County District Attorney's office during voir dire. We take this opportunity to commend the prosecutor for her professionalism and diligence in promptly bringing the issue to the trial court's attention once she learned of this issue.

[8] Evidently, the case in which Juror No. 7 was a victim had concluded with a plea about 30 minutes before the prosecutor notified the trial court about the issue.

at least put that on the record, Judge, for the same reasons." The trial court then brought Juror No. 7 out for the following exchange:

> THE COURT: Okay. I forgot to ask you a couple more questions. During voir dire I'm not—I don't think that you raised your card that you knew somebody or had some contact with the Fulton County D.A.'s Office? Do you remember that?
>
> JUROR: I remember a question related to something like that being asked, but I didn't feel like it applied to me directly, because the—I was never—I was never robbed. I left the bag unattended, and when I came back to get it, it wasn't there.
>
> THE COURT: Right.
>
> JUROR: But after I left, I did tell your assistant there—I can't remember her name.
>
> THE COURT: Ms. Simpson.
>
> JUROR: Yeah. Because it came to my mind, and then I told her because it felt like maybe there could have been some relevance to it.
>
> THE COURT: Okay. And does that have any—any impact on you?
>
> JUROR: No, not at all.
>
> THE COURT: Okay. All right. Thank you very much.

DEFENSE COUNSEL: Nothing further on that from Mr. Malcolm.

PROSECUTOR: Nothing further.

THE COURT: All right. I'm going to keep her on.

"OCGA § 15-12-172[9] vests the trial court with broad discretion to replace a juror with an alternate at any point during the proceedings where, among other reasons, it is shown that the juror is unable to perform his or her duty or legal cause exists." *Morrell v. State*, 313 Ga. 247, 263 (2022). "Whether to strike a juror for cause lies within the sound discretion of the trial judge, and the trial court's exercise of that discretion will not be set aside absent a manifest abuse of discretion." *Jones v. State*, 314 Ga. 605, 614 (2022) (punctuation omitted). And,

> [t]o excuse for cause a selected juror in a criminal case on the statutory ground that her ability to be

---

[9] This statute provides:

If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated. Further replacements shall be made in similar numerical sequence provided the alternate jurors have not been discharged. An alternate juror taking the place of any incapacitated juror shall thereafter be deemed to be a member of the jury of 12 and shall have full power to take part in the deliberations of the jury and the finding of the verdict. Any verdict found by any jury having thereon alternate jurors shall have the same force, effect, and validity as if found by the original jury of 12.

OCGA § 15-12-172.

14

fair and impartial is substantially impaired, a challenger must show that the juror holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence.

*McCabe v. State*, 319 Ga. 275, 285 (2024) (concluding no abuse of discretion in refusing to remove juror who expressed some concern for her safety but denied overhearing "any conversation among the jurors [about the case] or said anything herself pertaining to this case").

Although the question is a close one, we conclude that the trial court acted within its broad discretion in determining that the juror did not intentionally commit misconduct by not responding to questions during voir dire about whether she knew anyone in the Fulton County District Attorney's office or whether she had a case in Fulton County and that the juror could remain fair and impartial.[10] See *Bridges v. State*, 314 Ga. 395, 398 (2022) ("A conclusion on an issue of juror bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province, and those findings are to be given deference." (punctuation omitted)). The record supports that, although Juror No. 7 did not respond accurately to the voir dire questions because she did not consider herself to be a victim of a crime, upon reflection, she later brought her inaccurate response to the attention of court staff. Also, Juror No. 7 testified that there was no reason that she could

---

[10] In its order denying the motion for new trial, the trial court noted that "after proper inquiry into Petit Juror No. 7, the trial court properly found no misconduct."

15

not be fair and impartial in the case, and the trial court was authorized to credit this testimony. See *Tyson v. State*, 312 Ga. 585, 589 (2021) (trial court was authorized to credit the direct testimony of the juror that he did not fail to disclose his work relationship with the victim's mother). We have previously explained that it is not an abuse of discretion to decline to remove a juror who does not respond to voir dire questions accurately where the trial court determined that the juror had not deliberately omitted information or otherwise tried to be deceptive. See *Basulto v. State*, 316 Ga. 696, 700 (2023) (trial court did not abuse its discretion in declining to remove a juror who had failed to disclose requested information during voir dire and who alerted the trial court to his false statement before the jury was sworn because the juror had not deliberately omitted information or otherwise tried to be deceptive).

Moreover, although Malcolm argues that the juror's connection with the Fulton County District Attorney's office was material information that would have impacted whether the juror should have been removed for cause, we conclude that the trial court did not abuse its discretion in failing to remove the juror for cause. See *Terrell v. State*, 313 Ga. 120, 124–26 (2022) (discerning no abuse of discretion in failing to excuse a juror for cause who stated during voir dire that, despite "her cousin's conviction for armed robbery and her ex-boyfriend's shooting … she would attempt to separate those issues from anything she heard in this case and would do her best to be fair"); *Brockman v. State*, 292 Ga. 707, 723 (2013) (concluding no abuse of discretion when the trial court denied motion to strike prospective juror who stated during voir dire that he "tended to be analytical, that he could be fair about the case, and that his relationship with the victim's brother would not consciously affect his ability to be impartial"). And to the extent that Malcolm is arguing that he would have

used a peremptory strike on this juror, rather than on other potential jurors, Malcolm has failed to show that he was harmed. Cf. *Willis v. State*, 304 Ga. 686, 707 (2018) ("[W]e hold that a defendant is not presumptively harmed by a trial court's erroneous failure to excuse a prospective juror for cause simply because the defendant subsequently elected to remove that juror through the use of a peremptory strike. Instead, such a defendant must show on appeal that one of the challenged jurors who served on his or her twelve-person jury was unqualified."). Malcolm has not demonstrated an abuse of the trial court's discretion, and this enumeration fails.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*