**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0752
Deon Altron Ellison
v.
The State

On Appeal from the Superior Court of Hall County
No. 23CR1109APP

Decided: April 21, 2026

PETERSON, Chief Justice.

Deon Altron Ellison appeals his convictions for felony murder and a firearm offense, stemming from the 2023 shooting death of his cousin, Jeremiah James Bonds.[1] Ellison argues that the trial court erred in denying him a new trial because (1) the verdicts were inconsistent, and (2) the State engaged in various forms of misconduct regarding its handling of a witness. He also

---

[1] The crimes were committed in the early morning of August 4, 2023. On August 30, 2023, a Hall County grand jury returned an indictment charging Ellison with malice murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony. At a trial from October 29 to November 1, 2024, a jury acquitted Ellison of malice murder but found him guilty of the other charges. On November 4, 2024, the trial court sentenced Ellison to life in prison for felony murder and a consecutive sentence of five years of probation for the firearm count; the aggravated assault count merged. Trial counsel filed a timely motion for new trial, which was amended by trial counsel in April 2025. Following a hearing, the trial court denied the motion in an order entered on December 11, 2025. Ellison filed a timely notice of appeal, and the case was docketed to this Court's April 2026 term of court and submitted for consideration on the briefs.

argues that the trial court erred by (3) improperly restricting voir dire and (4) denying a motion for mistrial based on improper closing argument by the State. We conclude that (1) any inconsistencies among the verdicts do not present a basis for reversal, (2) Ellison failed to make the requisite showing of prosecutorial misconduct, (3) the claim about voir dire is not preserved, and (4) neither is the claim that the trial court erred in denying a mistrial over the State's closing argument. We affirm.

In the early morning hours of August 4, 2023, Ellison, Bonds, and Ellison's girlfriend Brittney Lawrence were travelling together in Ellison's car from the Atlanta area towards Gainesville, where Ellison lived. Bonds was driving. As the vehicle exited I-985 at Exit 24 in Hall County, Ellison fatally shot Bonds in the back of the head while Bonds was still sitting in the driver's seat with his seat belt on, his foot on the gas pedal, and a gun magazine in his pocket. Ellison fled the scene and was apprehended without incident later that day.

Ellison admitted to officers that he shot Bonds and gave various explanations for the shooting, including that he had acted because he was in fear for his life. Ellison argued self-defense at trial and testified in his own defense. According to Ellison's testimony, in the days leading up to the shooting, Bonds's behavior and comments became increasingly concerning, as he said he put "hits" on and robbed people. Ellison found Bonds with Ellison's gun more than once, including on the day leading up the shooting, at which point Bonds had the gun's standard magazine in his hand. Driving to Hall County, Bonds drove erratically, ignored a request to stop the vehicle or let Ellison drive, and at one point said, "I'm gonna show you murder." Bonds did not stop at the exit he was supposed to use to let himself out, instead

traveling to the exit where he was ultimately shot by Ellison, about a mile and a half from Ellison's family's home. As they got off the exit, Ellison testified, Ellison asked Bonds to let him out of the vehicle so the two could "squash it," but Bonds refused to stop and let Ellison out. Bonds told Ellison, "I'm finna put this rocket on you, just wait and see." When he shot Bonds, Ellison claimed, he feared for his life and Lawrence's safety and believed that he was being taken to an unknown location against his will. On cross-examination, Ellison acknowledged that Bonds had not pointed a gun at him, that Bonds was not in possession of a gun at the time of the shooting, and that Bonds was actively driving the vehicle when Ellison shot him in the back of the head.

Ellison's girlfriend, Lawrence, told a different story at trial. She testified during the State's case-in-chief that, although she was uncomfortable with Bonds's driving style, because he was "kind of swerving a little" and "on a race," she otherwise did not feel in danger until Ellison shot Bonds. Lawrence asked Ellison to take over driving, but Ellison told her to let Bonds drive, and she never heard Ellison ask Bonds to let him drive. At one point on the drive, she said, Bonds called Ellison a "dumbass," which caused Ellison's demeanor to change. The two men began arguing, with Ellison asking Bonds for "respect," and Bonds saying that Ellison was trying to impress his girlfriend. At some point, Ellison reached between the driver's seat and the center console and retrieved a gun; Lawrence heard the gun make a "cha-cha" sound before Ellison placed it on the floorboard. Lawrence testified that Ellison shot Bonds while Bonds was facing forward and driving, after Bonds repeatedly failed to respond to Ellison.

1.      Ellison argues that he is entitled to a new trial because the verdicts were legally inconsistent. We disagree.

3

Ellison was charged with malice murder, felony murder predicated on aggravated assault, and aggravated assault, as well as a firearm count. Both the felony murder and aggravated assault counts alleged assault by use of a deadly weapon by firing a handgun at Bonds. The jury was instructed on justification and voluntary manslaughter. The jury acquitted Ellison of malice murder but convicted him of felony murder predicated on aggravated assault, declining the option on the verdict form to find Ellison guilty of voluntary manslaughter as an offense included within malice murder and felony murder.

Ellison appears to argue that, based on this record, the jury needed to find essentially the same intent as to malice murder, felony murder, and aggravated assault, such that an acquittal on malice murder is inconsistent with verdicts of guilty as to felony murder and aggravated assault. But this Court abolished the inconsistent verdicts rule in Georgia decades ago, "based on the principle that it is not generally within the trial court's power to make inquiries into the jury's deliberations, or to speculate about the reasons for any inconsistency between guilty and not guilty verdicts." *Dugger v. State*, 297 Ga. 120, 122 (2015) (cleaned up). We have said that *repugnant* verdicts of conviction must be vacated, but repugnant verdicts occur only when, "in order to find the defendant not guilty on one count and guilty on another, the jury must make *affirmative* findings shown on the record that cannot logically or legally exist at the same time." *Feder v. State*, 319 Ga. 66, 68 (2024); see also *Turner v. State*, 283 Ga. 17, 19–21 (2008) (reversing felony murder and aggravated assault convictions where jury in acquitting on malice murder charge expressly found on jury verdict form that the appellant had been

4

justified in his action).[2]

Here, the jury made no such affirmative finding of justification, and it did not exercise the option to find Ellison guilty of voluntary manslaughter instead of malice murder. Although Ellison suggests that the jury's acquittal on malice murder may mean that it necessarily found that he was justified in his actions, "we cannot know and should not speculate why a jury acquitted on one offense and convicted on another offense. The reason could be an error by the jury in its consideration or it could be mistake, compromise or lenity." *Feder*, 319 Ga. at 69 (cleaned up).

2.      Ellison argues that the State engaged in various forms of misconduct in its handling of the testimony of Lawrence, Ellison's girlfriend. Specifically, Ellison argues that the State (a) knowingly presented and failed to correct false and misleading testimony in violation of *Napue v. Illinois*, 360 US 264 (1959),[3] (b) engaged in improper mid-trial contact with Lawrence, and (c) suppressed impeachment evidence regarding that meeting in violation of *Brady v. Maryland*, 373 US 83 (1963). We conclude that the trial court did not err in denying Ellison's request for a new trial on these grounds.

---

[2] The United States Supreme Court has decided that under the federal Double Jeopardy Clause, only the verdicts of conviction may be vacated under our repugnant-verdict doctrine; the verdicts of acquittal must stand. See *McElrath v. State*, 319 Ga. 539, 540 & n.2 (2024) (citing *McElrath v. Georgia*, 601 US 87, 96–98 (2024)). Whether that warrants reconsideration of our repugnant-verdict doctrine altogether is an important question that does not arise here, as the verdicts are not repugnant, and no party has asked us to reconsider that doctrine.

[3] Ellison also states in his briefing on appeal that the State's actions in this regard violated "Georgia Law," but he makes no independent argument about Georgia law.

Early in Lawrence's trial testimony, when the prosecutor asked Lawrence what had happened right before Bonds called Ellison a "dumbass," Lawrence, crying, stated that she couldn't remember, at which point the trial court asked Lawrence if she needed a break, and she said yes. Lawerence's direct testimony continued following the break, with Lawrence testifying about Ellison and Bonds arguing about respect and Ellison shooting Bonds after Bonds failed to respond to Ellison. During discussion of a defense objection to a question the prosecution posed to Lawrence, defense counsel suggested that Lawrence was "emotional" because earlier in the week the State had played for her recorded jail calls between Ellison and another woman "to turn her and piss her off[.]" In response, the prosecutor said, "I didn't play any jail calls"; the trial court cut off defense counsel's attempt to inquire further.

At the outset of cross-examining Lawrence, defense counsel asked her about a meeting with the prosecution over the break in her testimony. Lawrence initially appeared to acknowledge that she remembered more after the break in her testimony, saying, "I had to refresh my memory." Asked whether that occurred "after meeting with [the prosecutor] in her office," Lawrence said, "No," but then stated she had met with the prosecutor, albeit not "in her office." Lawrence testified that "[n]obody" refreshed her recollection and "[n]obody in the district attorney's office" told her what to say, explaining that she remembered more because, "I would sit and think." Additionally, when asked by defense counsel whether Lawrence had called Ellison the prior week and told him "about recorded jail calls that you heard that were played to you by the prosecutor's office," Lawrence replied, "Nothing was played to me." Asked how she knew of the calls, Lawrence responded that "[t]hey were told to [her]" by the trial prosecutor.

6

Later, in the middle of the defense case, the defense announced that it was "making a motion for a *Napue* violation" based on allegedly false testimony by Lawrence that, in defense counsel's words, she had "no clue what recorded calls we were talking about." The trial court indicated it would take up the matter later. The matter was discussed further during the charge conference, with the trial court rejecting the defense's request to instruct the jury that the State knew that Lawrence had given false testimony such that Lawrence's testimony would be stricken from the record. After the verdicts but before sentencing, Ellison made a "Motion for Mistrial and [Judgment] Notwithstanding [the] Verdict"[4] based on grounds of both inconsistent verdicts and prosecutorial misconduct. Defense counsel argued that the State had allowed Lawrence to testify falsely as to her knowledge of the recorded calls in violation of *Napue*; engaged in "tampering with witnesses," apparently by meeting with Lawrence in the middle of her testimony; and violated *Brady* by failing to turn over to the defense the contents of that mid-testimony conversation. Defense counsel introduced as a record exhibit a recording of a conversation between Lawrence and Ellison in which she apparently referenced romantic conversations between Ellison and other women and reminded Ellison that his jail calls are recorded. The trial court denied the motions, saying the *Napue* and *Brady* claims had "already been addressed several times[.]"

In his motion for new trial, Ellison continued to argue that the State had violated *Napue* and *Brady* and engaged in "tampering with a witness." In addition to alleging that Lawrence testified falsely about jail calls between Ellison and other women,

---

[4] A defendant cannot obtain a mistrial after a verdict is returned. See *Lester v. State*, 310 Ga. 81, 90 (2020), disapproved on other grounds by *Clark v. State*, 315 Ga. 423, 435 & n.16 (2023).

the motion alleged that Lawrence testified falsely about meeting with the prosecution over the break in her testimony.[5] At the motion for new trial hearing, Ellison introduced into evidence courthouse surveillance video of the two trial prosecutors and two other people entering a probation room during the day that Lawrence testified at trial and then leaving together about 10 minutes later.[6] In its order denying the motion for new trial, the trial court found that Ellison had "failed to establish the fact of any false testimony from Ms. Lawrence as to the subjects he raises in his amended motion for new trial" and that "the Court cannot find upon the record before it that the State knowingly elicited materially false testimony, nor that the State failed in its duty to correct it." The trial court found that Ellison could "not show that the prosecution discussed [Lawrence's] testimony nor attempted to influence her statement in any way[,]" finding that "[a]ny change in the witness's demeanor can be just as readily attributed to the change in the positioning of the podium during questioning,[7] and any alleged inconsistencies in the witness's statements were allowed to be explored through cross-examination." The trial court also found that, "as there has been

---

[5] The motion also alleged that Lawrence testified falsely in other respects not pursued on appeal.

[6] It is not clear that the time of this meeting shown on the video corresponded with the time of Lawrence's testimony, but that was not raised at the motion for new trial hearing.

[7] In his brief to this Court, the District Attorney recounts that when Lawrence retook the witness stand after the break in her testimony, counsel for the State had moved the podium so that Lawrence's "gaze would be away from" the defendant and the people in the gallery. The transcript merely reflects that the trial prosecutor stated, "I'm going to stand over here," the defense objected that the prosecutor was blocking the jury's view of the witness, and the trial court overruled the objection, saying, "She's not in the way."

no showing that the witness made any material statement during her time in the hallway conference room, the Court cannot find any statement that was required to have been provided to the defense. As such, the State did not violate any such duty to disclose such information to Defense or to the Court."

(a) Under *Napue*, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[.]" 360 US at 269. "To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared." *Glossip v. Oklahoma*, 604 US 226, 246 (2025) (cleaned up). "Even if a defendant makes this showing, a new trial is warranted only if the false testimony may have had an effect on the outcome of the trial[,] that is, if it in any reasonable likelihood could have affected the judgment of the jury." *Hart v. State*, 322 Ga. 1, 18 (2025) (cleaned up). Additionally, we note that "the trial court's findings of fact on motion for new trial are upheld unless clearly erroneous." *Strother v. State*, 305 Ga. 838, 850 (2019) (quotation marks omitted).

On appeal, Ellison claims two instances of false testimony by Lawrence. First, he argues that "Lawrence denied having been shown or told about recorded jail calls involving" Ellison. Second, he argues that Lawrence "denied having any mid-trial contact with the prosecution during a break in her testimony." But the trial court found that Ellison "has failed to establish the fact of any false testimony from [] Lawrence as to the[se] subjects[.]" We cannot say that finding is clearly erroneous, because the record does not support Ellison's characterization of Lawrence's testimony as including denials that she met with the prosecution on a break and that the prosecutor had told her about recorded

9

jail calls involving Ellison. Asked at trial about "recorded jail calls," Lawrence replied, "Nothing was played to me." But asked how she knew of the calls, Lawrence indicated that the prosecutor had told her about them. And although Lawrence initially gave a response that suggested that she had not met with the prosecutor on a break in the prosecutor's office, she then clarified that she had met with the prosecutor, albeit not "in her office." Therefore, Ellison's *Napue* claim is without merit. See *Strother*, 305 Ga. at 850–51 (*Napue* claim without merit where record supported the trial court's finding that witness did not testify falsely).

(b) Although Ellison includes in his enumerations of error an argument that the prosecution's contact with Lawrence during trial was itself "improper," he has not met his burden to show reversible error on this basis, either. Citing *Geders v. United States*, 425 US 80 (1976), Ellison argues that "[i]mproper influence or coaching of a witness during testimony *may* implicate due process concerns." (Emphasis supplied.)[8] But he offers no specific argument, let alone authority, that the prosecution's actions in meeting with Lawrence here provide a basis for reversal.

It is true that "[a]n attorney must respect the important ethical distinction between discussing testimony and seeking improperly to influence it." *Geders*, 425 US at 90 n.3, quoted in *Glossip*, 604 US at 251 n.9. But whether a prosecutor improperly coaches a witness is a question of fact. See *Jones v. State*, 302 Ga. 488, 494 (2017). And here the trial court specifically found that

---

[8] *Geders* involved facts very different from those presented here. See 425 US at 91 (holding that order preventing criminal defendant from consulting with his lawyer "about anything" during an overnight recess impinged on his Sixth Amendment right to counsel, while stating "we do not deal with limitations imposed in other circumstances").

Ellison did not "show that the prosecution discussed her testimony nor attempted to influence her statement in any way." Rather, the trial court found that "the witness was taken to a conference room in the courthouse hallway to regain her composure during [] emotional testimony." The trial court also found that "[a]ny change" in Lawrence's demeanor "can be just as readily attributed to the change in the positioning of the podium during questioning" and "any alleged inconsistencies" in Lawrence's testimony "were allowed to be explored through cross-examination." We cannot say the trial court's findings in this regard were clearly erroneous on this record. On appeal, Ellison does not point to any particular way in which Lawrence's testimony changed after the break to give rise to an inference of improper influence; he merely states that counsel "proffered" at trial material changes in Lawrence's testimony, while citing to a portion of the transcript that does not contain such allegations. It is not obvious from the transcript that Lawrence's testimony changed in a material way after the break, and her testimony was that "[n]obody" in the DA's office told her what to say. Therefore, any claim that the prosecution improperly coached Lawrence during a break fails. See *Jones*, 302 Ga. at 494 (no abuse of discretion in denying a mistrial, where there was sufficient evidence to support trial court's finding regarding witness coaching).

(c) Ellison also appears to suggest that the State may have violated *Brady*[9] when it did not disclose the prosecution's meeting with Lawrence during her testimony. To prevail on a *Brady* claim,

---

[9] Ellison appears to back away from this claim both in a "Corrected Brief" that he filed before the State filed its responsive briefing and more explicitly in his Reply Brief, stating in his Reply Brief that he is not actually making a "freestanding *Brady* claim" but merely "preserves the issue as a credibility problem[.]"

a defendant must show that (1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different. *Anglin v. State*, 312 Ga. 503, 510 (2021). "In the case of an untimely disclosure, a defendant must show that an earlier disclosure would have benefited the defense and that the delayed disclosure deprived him of a fair trial." Id. (quotation marks omitted). "On appeal, a trial court's factual findings on a *Brady* claim are reviewed under a clearly erroneous standard, and its application of the law to the facts is reviewed de novo." *Hood v. State*, 311 Ga. 855, 863 (2021).

To the extent that Ellison argues that the State violated *Brady* merely by failing to disclose the fact of its meeting with Lawrence in the middle of her testimony, it is obvious that defense counsel was aware of, or suspected, the existence of the meeting itself, as he asked Lawrence about it at the start of cross-examination, and she confirmed that the meeting happened. To the extent that Ellison argues that the State somehow should have informed defense counsel of this meeting prior to defense counsel learning of it, he has not even argued how this delay deprived him of a fair trial. And to the extent Ellison argues on appeal that the State violated *Brady* by failing to disclose some material statement that Lawrence made in her meeting with prosecutors, the trial court found in its order denying the motion for new trial that "there has been no showing that [Lawrence] made any material statement during her time in the hallway conference room[.]" In the absence of evidence to the contrary, we cannot say that finding is clearly erroneous. Thus, Ellison's *Brady* claim fails.

12

3. Ellison argues that the trial court erred by improperly restricting voir dire. This claim is not preserved.

Prior to voir dire, the parties each gave the trial court written proposed voir dire questions, although the proposals apparently were not filed and are not in the record. The parties briefly discussed the defense's proposed questions with the trial court, referring to the proposals by number. Although the exact wording of the proposed questions is not contained in the record, the discussions surrounding them suggests that they generally concerned defense counsel's desire to get background knowledge about the jurors, including relationships with their families, and to ensure that jurors understood that a person was not guilty of murder simply by virtue of having killed someone. For several questions the trial court ruled that it would not allow them, soliciting the State's input. Ellison did not make contemporaneous objections to any of the trial court's rulings as to these questions prior to voir dire. And when the trial court sustained the State's objection in the midst of voir dire to a question proposed by Ellison, asking something along the lines of whether "anybody has ever been in a situation where they were put in danger or stuck in that situation," defense counsel stated that he was "okay" with the trial court's ruling.

Ellison now argues that the trial court erred by restricting voir dire. But Ellison's claim is not preserved for review. Ellison does not cite any objection on his part to a ruling by the trial court as to proposed voir dire questions. And the transcript of the trial court's colloquy with the parties about the parties' proposed questions prior to voir dire does not reveal any instance in which Ellison objected to any of the rulings of the trial court disallowing certain questions proposed by the defense. Although there was a later instance during voir dire in which the parties put on the

record information about a side-bar discussion about a particular question proposed by the defense, defense counsel indicated he was "okay" with the trial court's adverse ruling. We have not found any point during voir dire where defense counsel objected to a trial court ruling disallowing a defense question. Because this unpreserved claim is not the type of claim that is subject to plain error review, there is nothing for this Court to review. See *Brandon v. State*, 311 Ga. 258, 259 (2021); *Ledford v. State*, 289 Ga. 70, 81–82 (2011), disapproved on other grounds by *Willis v. State*, 305 Ga. 686, 706–07 & n.3 (2018).

4. Finally, Ellison argues that the trial court erred by denying a motion for mistrial based on improper closing argument by the State. This issue also is not preserved.

In his separately-listed enumerations of error, Ellison argues only that "[t]he trial court erred in denying Appellant's motion for mistrial where the State engaged in improper and prejudicial closing argument." But in his briefing in support of this enumeration, Ellison does not cite to any point in the record where the trial court denied a motion for mistrial based on the State's closing, or even mention further a putative request for a mistrial. Because Ellison does not appear to have made a motion for mistrial based on any portion of the State's closing argument, the argument that the trial court should have declared a mistrial based on the State's closing argument was not preserved for appellate review. See *Thomas v. State*, 310 Ga. 579, 581–82 (2020) (to preserve issue, defendant must make a contemporaneous motion for a mistrial at the time the defendant becomes aware of the matter giving rise to the motion); *Bedford v. State*, 263 Ga. 121, 121–22 (1993) (where trial court did not actually rule that the Appellant could not produce a good character witness, "there [was] no ruling upon which this [C]ourt [could] pass"). And to the

14

extent that Ellison argues in his briefing that the trial court erred by overruling his objections to aspects of the State's arguments to the jury and that any such rulings themselves provide a basis for reversal even in the absence of a request for a mistrial, "an appealing party may not use its brief to expand its enumerations of error by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of errors." *Wallace v. State*, 303 Ga. 34, 37–38 (2018) (quotation marks omitted).

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*